697 So.2d 833 (1997)
Eddie Lee SEXTON, Appellant,
v.
STATE of Florida, Appellee.
No. 86132.
Supreme Court of Florida.
July 17, 1997.
*834 James Marion Moorman, Public Defender and Andrea Norgard, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Carol M. Dittmar, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Eddie Lee Sexton. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Sexton was convicted of first-degree murder for the death of Joel Good, the husband of Sexton's daughter Pixie. Good was strangled to death by Sexton's son Willie, who was *835 named as a codefendant but later found incompetent to stand trial.
Sexton moved to Florida in 1993 with his family and the victim to avoid arrest and prevent authorities in Ohio from removing his children from the home.[1] They originally stayed with Sexton's sister in Tampa but later moved to Hillsborough River State Park. While residing there, Sexton's infant grandchild, the son of Pixie and Joel, died under suspicious circumstances.[2] Sexton had Willie and Joel bury the baby in the woods.
Joel, who was very upset over the death of the baby, wanted to go with Pixie and her two daughters back to Ohio. It was then she told Joel that Sexton was the father of her two girls. When Joel confronted Sexton with this information, Sexton told Joel that he would have to raise the children as his own and that he would not make it back to Ohio if he tried to go. Sexton told Pixie that he would report her for killing the baby if she left.
At some point, the family moved to Little Manatee State Park. Pixie testified to the following course of events. On the day of Joel's murder, Sexton, his wife, and the younger Sexton children left the campsite for a picnic. Sexton's daughter Sherry, Pixie, their respective children, Willie, and Joel stayed behind. Pixie saw Willie and Joel leave the camp site. She followed them into the woods, smoked with them, and then returned to the camper. Later, she heard Joel yell "Ed" (Sexton) and went back to the woods with Sherry, where they found Willie choking Joel with a rope. Willie instructed Pixie to go back to the camper. There she found Sexton, who had just returned from the picnic, and brought him back to where Willie and Joel were.
Pixie further testified that Joel was unconscious when Sexton arrived at the scene. Sexton kicked Joel's leg, and, upon seeing the leg move in response, told Willie to "finish him off." Sexton ordered Pixie to purchase a shovel and then he and Willie buried Joel's body while the others were instructed to get rid of Joel's belongings. Sexton told the family that Joel was supposed to have run off. Pixie said she heard Sexton tell his wife that night that he "had Willie do it." She had heard Sexton say Joel had to be "gotten rid of" on two other occasions. On one of those occasions (two weeks before the murder), Sexton had said Joel "had too much on him."
Sherry testified for the defense and gave a different version of events. According to Sherry, Pixie was involved with Willie in the assault on Joel and would not let Sherry go into the woods when she heard Joel yell for help. She also testified that Sexton was angry and upset with Willie and asked him why he had killed Joel. Willie responded that he was afraid Joel would tell about the baby's death. According to Sherry, Pixie said she was glad Joel was dead.
The jury recommended death by a vote of seven to five. The trial court found in aggravation (1) that Sexton was previously convicted of a prior violent felony (robbery); (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (3) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP).[3] In mitigation, the trial court found that Sexton was under emotional *836 strain due to the efforts of Ohio officials to take custody of his children; that he acted in a peculiar fashion at times; that he demonstrated some human qualities; that he played Santa Claus on at least one occasion and appeared to some as normal; and that letters from family members described Sexton as kind, respectful, and helpful. The trial court found that the evidence did not support the claim that Sexton was disabled and dependent on pain medication.
Finding that the aggravators outweighed the mitigators, the trial court sentenced Sexton to death.
Sexton raises four issues in this appeal. He first challenges the admission of testimony given by five of his children that he beat them, conducted "marriage" ceremonies with his daughters, had regular sex with them and fathered several of their children, encouraged his children to have sex with each other, made his sons compare their penis sizes and ridiculed them, practiced Satanism and engaged in other bizarre conduct, threatened his children if they discussed family matters with others, trained his children how to kill FBI agents, engaged in a standoff with police in Ohio shortly before coming to Florida, fled to Florida to prevent his children from being taken into custody, and directed the killing of his infant grandchild, who was Joel Good's son.
In support of his argument, Sexton contends that the trial court improperly admitted this evidence of collateral bad acts in violation of Williams v. State, 110 So.2d 654 (Fla.1959), which is codified in section 90.404(2)(a), Florida Statutes (1993). Saffor v. State, 660 So.2d 668, 670 (Fla.1995). Section 90.404(2)(a) provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, but is inadmissible when the evidence is relevant solely to prove bad character or propensity.
The State counters that evidence of Sexton's collateral bad acts was not proffered and admitted as similar fact evidence under section 90.404(2)(a), but rather as "dissimilar fact" evidence under section 90.402, which simply states that all relevant evidence is admissible except as provided by law. Specifically, the State argued at trial that Sexton's prior bad acts were relevant to prove that Sexton had a motive to kill Joel Good; namely, that Joel Good knew that Sexton, who was on the run, was the father of his own grandchildren and was responsible at least in part for the death of Pixie and Joel's baby. The State also argued that evidence concerning Sexton's treatment of his children throughout the years was necessary to prove that Sexton controlled and directed every facet of Willie's life to such an extent that Willie would kill at his father's direction.
It is true that these collateral acts were not similar to the murder for which Sexton was tried in this case and therefore could not have been admitted under section 90.404(2)(a). See Garron v. State, 528 So.2d 353, 358-59 (Fla.1988). Indeed, the State did not proffer this evidence under section 90.404(2)(a). However, the fact that this evidence was not admissible under section 90.404(2)(a) does not mean that it was not admissible at all. As we stated in Williams, 110 So.2d at 659:
Our initial premise is the general canon of evidence that any fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion. Viewing the problem at hand from this perspective, we begin by thinking in terms of a rule of admissibility as contrasted to a rule of exclusion.

Later, in Bryan v. State, 533 So.2d 744, 746 (Fla.1988), we explained:
Evidence of "other crimes" is not limited to other crimes with similar facts. Socalled similar fact crimes are merely a special application of the general rule that all relevant evidence is admissible unless specifically excluded by a rule of evidence. The requirement that similar fact crimes contain similar facts to the charged crime is based on the requirement to show relevancy. This does not bar the introduction *837 of evidence of other crimes which are factually dissimilar to the charged crime if the evidence of other crimes is relevant.
Thus, section 90.404 is a special limitation governing the admissibility of similar fact evidence. But if evidence of a defendant's collateral bad acts bears no logical resemblance to the crime for which the defendant is being tried, then section 90.404(2)(a) does not apply and the general rule in section 90.402 controls. A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion. Heath v. State, 648 So.2d 660, 664 (Fla.1994).
However, relevancy is not the only test for admissibility. Even after determining that evidence is relevant, a trial court in every case must also consider section 90.403. Section 90.403 states in pertinent part:
Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
Section 90.403 does not bar the introduction of all evidence that is prejudicial or damaging to the party against whom it is being offered; indeed, as a practical matter, almost all evidence introduced during a criminal prosecution is prejudicial to a defendant. Amoros v. State, 531 So.2d 1256, 1258 (Fla.1988). In reviewing testimony about a collateral bad act that is admitted over an objection based upon section 90.403, a trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice substantially outweighs the probative value of the evidence should it be excluded. Id.
With respect to the evidence that Sexton had fathered two of Pixie's children, was involved in the death of Pixie and Joel's baby, and had engaged in a standoff with Ohio police that resulted in him becoming a fugitive, we find that the trial court did not abuse its discretion in ruling this evidence relevant. We also conclude that the trial court did not abuse its discretion in performing the necessary weighing process and admitting this evidence. Because Sexton did not actually kill Joel Good, a material issue was whether Sexton had a motive for wanting Joel Good dead such that he would direct another person to commit the crime. The record shows that Joel Good, who had knowledge of all of this information, had expressed a desire to return to Ohio. Had the trial court excluded this evidence, the jury would not have understood why Sexton perceived Joel Good as a threat.
We turn now to the evidence regarding Sexton's treatment of his children. The State argues that it was necessary to describe the nature of Sexton's relationships with his children to explain how he could have successfully directed Willie to kill Joel Good and gain the acquiescence of his other children. The State adds that the probative value of this evidence was high because without it, the jury would have been left wondering why Willie would kill for his father.
While some of this evidence may have been relevant, we cannot agree that as presented, it was not substantially outweighed by its unfairly prejudicial impact. The State presented the testimony of no less than five of the Sexton children, eliciting from each one the litany of bizarre behavior and abuse they had endured from their father. Much of this testimony had no bearing upon Sexton's treatment of Willie. For example, testimony that Sexton conducted fake marriage ceremonies with his daughters, had sexually abused several of them, and was the father of Sherry's son was, at best, only remotely relevant to the issue of whether Sexton exercised domination and control over Willie. However reprehensible his behavior was, Sexton was not on trial for the maltreatment of his children. Yet the jury could only have been inflamed by this damaging testimony and might have been moved to punish Sexton for those collateral acts by finding him guilty of the murder in this case. See Steverson v. State, 695 So.2d 687 (Fla.1997) (admission of collateral evidence so prejudicial *838 as to require a new trial). We therefore cannot view this error as harmless and reverse on this basis. Because we reverse on this issue, we do not address Sexton's remaining arguments.[4]
The judgment and sentence are reversed for a new trial.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] The Department of Human Services in Ohio had Sexton's six youngest children removed from the home in 1992. (Sexton has thirteen children, not counting the children he allegedly fathered with two of his daughters.) The three youngest were returned to Mrs. Sexton's custody but Sexton was ordered to have no contact with his children or with Mrs. Sexton. Following a hearing in November of 1992, Sexton barricaded himself and his family in their house. Eventually he turned himself in, but he and his wife failed to appear at a subsequent hearing.
[2] Pixie testified that the baby had been ill for weeks but Sexton would not let her take him to the doctor. One night, he would not stop crying. Sexton ordered Pixie to quiet the baby or else he would do it for her. Pixie, who already had given the baby children's Tylenol and adult Nyquil, held her hand over the baby's mouth until it stopped crying. The next morning the baby was dead.
[3] The sentencing order also stated under its CCP finding that the murder "was especially atrocious or cruel." However, the State did not argue, nor was the jury instructed on, the heinous, atrocious, or cruel (HAC) aggravator.
[4] Sexton also argued on appeal (1) that the trial court erred in finding that the HAC aggravating circumstance applied; (2) that the death sentence was disproportionate; and (3) that Florida's death penalty statute is unconstitutional.