775 So.2d 923 (2000)
Eddie Lee SEXTON, Appellant,
v.
STATE of Florida, Appellee.
No. SC94487.
Supreme Court of Florida.
October 12, 2000.
Rehearing Denied December 21, 2000.
*925 James Marion Moorman, Public Defender, and Andrea Norgard, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Eddie Lee Sexton. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

BACKGROUND
The instant appeal arises from the retrial of Sexton as ordered by this Court in Sexton v. State, 697 So.2d 833 (Fla.1997). Sexton was initially tried and convicted of first-degree murder and sentenced to death in 1994 for the killing of Joel Good, the husband of Sexton's daughter, Estella Mae Good ("Pixie"). Joel was murdered by Sexton's mentally challenged twenty-two-year-old son, Willie Sexton, who strangled him to death under Sexton's direction. On appeal, this Court reversed the judgment *926 and sentence and ordered a new trial. See id. at 838. The Court determined that the testimony of five of Sexton's children concerning bizarre behavior and abuse they had endured from their father should not have been admitted because the relevance of the testimony was outweighed by its prejudicial impact. See id. at 837-38.
Upon retrial, Sexton was again convicted of first-degree murder and sentenced to death. Although much of the testimony introduced at the second trial was similar to the testimony introduced at the first trial, Willie testified.[1] In exchange for his testimony against Sexton, Willie pled guilty to second-degree murder and was sentenced to twenty-five years imprisonment. The State's theory of prosecution was that Sexton so totally dominated, controlled and directed every facet of Willie's life that Willie killed Joel at Sexton's direction. On retrial, the State introduced the following evidence.
Sexton fled to Florida in 1993 with his family and the victim to avoid arrest and prevent the Ohio Department of Human Services ("DHS") from removing his children from the home.[2] Sexton was the father of thirteen children, not counting the three children he allegedly fathered with his two daughters. After leaving Ohio, Sexton and his family moved to Oklahoma, Indiana, and eventually to Hillsborough River State Park in Florida. During this time, Sexton trained his children to use guns and a garrote, an apparatus used in strangulation, in case authorities came to return the children to foster care.
While residing in Hillsborough River State Park, Sexton's infant grandchild, Skipper Lee Good, the son of Pixie and Joel, died under suspicious circumstances. Several of the Sexton children, including Pixie, testified about the events surrounding the baby's death. Pixie testified that the baby had been ill for several weeks, but Sexton would not allow her to take the child to a doctor out of fear that authorities would find him and his family. One night, the baby would not stop crying. Sexton ordered Pixie to quiet the baby or else he would do it for her. Pixie put her hand over the baby's mouth until the child stopped crying. The next morning the baby was dead. Sexton instructed Willie and Joel to bury the baby in the woods inside the Hillsborough River State Park. Pixie was eventually arrested for the death of the baby and entered into a plea bargain with the State.[3]
According to Pixie, Joel was very upset over the loss of his child and wanted to bring the child back to Ohio for a proper burial. Shortly before the death of his infant son, Joel had learned Sexton was the father of Pixie's two daughters. After Joel confronted Sexton with this information, Sexton and Joel got into a fight. Because Joel knew about the baby's death and the fact that Sexton fathered two children with his daughter, Pixie, Sexton *927 would not allow Joel and Pixie to return to Ohio. Sexton feared Joel would provide authorities with information pertaining to the Sexton family's current whereabouts, the death of the baby, and ongoing child abuse.
Several of the Sexton children, including Willie, Pixie, Matthew and Charles testified that Sexton often referred to Joel as a "snitch" and stated that a "good snitch is a dead snitch." According to their testimony, Sexton often stated that Joel had to be disposed of because he "knew too much." In addition to the testimony of the Sexton children, Gail Novak, a librarian at the University of South Florida, also testified about a statement Sexton made in which he indicated his desire to have Joel killed. Novak testified that Sexton, Pixie, Joel and Willie came into the library in November 1993 and that Pixie requested information about crib death. Novak stated that she had overheard Willie telling Sexton that Joel intended to go back to Ohio. Sexton replied that the only way that Joel would be returning to Ohio would be in a "body bag."
At some point, the Sextons moved to Little Manatee State Park, the place where Joel was killed. Willie testified to the following course of events surrounding the murder.[4] As Joel continued to express his interest in returning to Ohio, Sexton began telling his son, "Willie, I got a job for you to do," and that he wanted Willie to "put Joel to sleep." On the day of Joel's murder, Sexton told his wife that "today is the day that Willie is going" to kill Joel. Thereafter, Sexton, his wife, and a few of the younger Sexton children left the campsite for a picnic. Sexton's daughters Sherri Sexton,[5] Pixie, and their respective children, along with Willie and Joel, stayed behind. Soon thereafter, Willie and Joel left the campsite and went into the woods. Both Pixie and Willie testified that Sexton returned from the picnic and joined Willie and Joel in the woods. According to Willie, Sexton told him to take the garrote out of his pocket and place it around Joel's neck. After placing the garrote around Joel's neck, Sexton told Willie to turn it "fast and hard." Willie told Joel that he was "just trying to put you to sleep." While Willie twisted the rope, Joel yelled "Eddie" (Sexton). After Willie saw blood coming out of Joel's ears, he asked Sexton what had happened. Sexton stated that Willie had just killed Joel. Sexton subsequently kicked the body and, upon seeing Joel's leg move, told Willie to "finish him off."
In addition to Willie, several other Sexton children testified to the events surrounding the murder of Joel and provided testimony that differed from Willie's recollections of the homicide. For instance, according to Pixie, on the day of Joel's murder, Sexton and Willie had gone for a walk. Approximately thirty minutes later, Sexton and Willie returned. After Sexton and several family members left for the family picnic, Pixie and Sherri went into the camper to prepare lunch, while Joel and Willie watched television together. Thereafter, Pixie saw Willie and Joel go into the woods. She followed them and found them smoking cigarettes. Upon her return to the campsite, she heard Joel yelling, "Ed." Pixie and Sherri ran into the woods and found Willie holding a rope around Joel's neck. Thus, Pixie and Sherri ran back to the campsite and told Sexton, who had returned from the picnic, that Willie was hurting Joel. After leading Sexton into the woods to find Joel and Willie, Pixie observed Willie holding Joel in his lap. According to Pixie, Sexton proceeded *928 to kick Joel's leg and, when Joel's leg moved, ordered Pixie to return to campsite and told Willie to "finish him off."
Another one of Sexton's children, Charles Sexton, who did not testify at the first trial, also testified that he witnessed Joel's murder. His version of the murder differed from both Pixie and Willie's version. In particular, Charles testified that he witnessed the murder and that Sexton actually committed the final act that led to Joel's death. Charles claimed that although he initially went along on the family picnic, he returned from the picnic sooner than the rest of the family. After finding the campsite empty upon his return, Charles walked into the woods and observed both Sexton and Willie killing Joel. Charles claimed that while Joel was fighting for his life, he overhead Sexton telling Willie, "It's either Joel or the both of you." Charles also testified that although Willie initially had placed the choking device around Joel's neck, Sexton actually "finished Joel off' by pulling on the choking device.
As to the post-murder events, Pixie testified that when Sexton returned from the woods, he instructed her to get rid of Joel's belongings and told her that if she ever talked about Joel's murder that she "would be next." She also testified that Sexton ordered her and Charles to go and purchase a shovel. Willie stated that before placing Joel's body in the grave, Sexton ordered him to chop Joel's hands off with a machete so that there would be no fingerprint evidence to identify the body.[6] Willie, however, was unable to complete this task.
Later that evening, Pixie overheard Sexton discussing the killing with Mrs. Sexton, at which time, Sexton stated that he had Willie murder Joel. According to all of the Sexton children who testified, they were instructed by their father to tell anyone, if asked, that Joel had taken the baby and had returned to Ohio. Matthew Sexton also testified that his father told him not to say anything about Joel's death because Sexton and Willie "could get the electric chair."
The State presented evidence that Willie had killed Joel because he was ordered to do so by Sexton and because he was afraid of his father. Doctor Eldra Solomon, a clinical psychologist with extensive training in the treatment of child abuse and post-traumatic stress disorder, testified that Willie was controlled by his father, whom Willie "was very eager to please." After reviewing Willie's school records and having Willie conduct the Wechsler Intelligence Test, Dr. Solomon concluded that Willie was developmentally behind and that he had problems with language, speech, memory and motor coordination. The I.Q. test revealed that Willie functioned at the level of a seven or eight-year-old and that ninety-nine percent of the people in his age group would have performed better on the test. Dr. Solomon opined that Willie could not comprehend the concept of death, suffered from post-traumatic stress disorder, and was incapable of planning a homicide.
When Willie talked about Sexton, Dr. Solomon noticed that Willie's demeanor changed dramatically. She observed that Willie began to shake, stammer and stutter, which Dr. Solomon believed were physical manifestations of his fears of his father. Both Dr. Solomon and many of the Sexton children, including Willie himself, testified regarding how Sexton had physically and mentally abused Willie. *929 According to Willie, Sexton began having anal intercourse with him at age nine. This activity continued during the Sextons' stay in Florida. Sexton physically beat Willie with his fists, a belt, a baseball bat, and an electric belt. In addition, Sexton mentally abused Willie by calling him "retarded" and a "stutter bug." Sexton often told Willie, "I brought you into this world, I can take you out of it."
In contrast to the first trial, at the conclusion of the State's case, Sexton presented no defense during the guilt phase of the trial. The jury convicted Sexton and recommended death by a vote of eight to four. The trial court found the following aggravating circumstances: (1) Sexton was previously convicted of a prior violent felony (robbery) (little weight); (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest (great weight); and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP) (great weight). In mitigation, the trial court found one statutory mitigator, that Sexton was under an extreme mental or emotional disturbance at the time the murder was committed and gave this mitigator great weight. This mitigator was established based upon the testimony of two psychologists, Doctors Irving Weiner and Frank Wood, who observed Sexton. Dr. Weiner's testing of Sexton revealed that Sexton has an I.Q. in the low 80s, suffers from brain dysfunction, has limited tolerance to stress, and has diminished self-control. Additionally, testing by Dr. Wood revealed that Sexton's brain was diseased, causing him to be non-responsive to emotional situations.
In addition, the trial court found and gave some weight to several nonstatutory mitigators: (1) Sexton was capable of kindness to children and would even act as Santa Claus at Christmas; (2) Sexton was the pastor of a church attended by family and friends; (3) Sexton often helped his mother and sisters with household chores and repairs; (4) Sexton's father died when the defendant was ten years old, depriving him of a male role model; and (5) the codefendant, Willie, received a lesser sentence of twenty-five years' imprisonment. Finding that the aggravators outweighed the mitigators, the trial court sentenced Sexton to death. Sexton raises five issues on appeal.

ANALYSIS

TESTIMONY RELATING TO THE DEATH OF SKIPPER LEE GOOD
The first issue that Sexton raises on appeal is whether the trial court erred in admitting into evidence testimony relating to the death of the infant, Skipper Lee Good. Sexton did not object to the admission of this testimony. Therefore, this claim of error is procedurally barred. See Gudinas v. State, 693 So.2d 953, 964 (Fla. 1997). Even if this issue had been preserved for review, however, we would find it to be without merit. During the retrial, the trial court made every effort to limit evidence of collateral bad acts to those that were relevant to two issues: (1) whether Sexton had a motive for killing the victim, his son-in-law, Joel Good; and (2) whether, and to what extent, Sexton could control and manipulate his son, Willie. For the reasons explained in our first opinion, the testimony relating to Skipper's death was relevant to explain Sexton's motive for having Joel killed and the total domination Sexton exerted over his family. See Sexton, 697 So.2d at 837.
In addition, although Sexton now challenges the admissibility of this evidence, part of the defense strategy in this case was to show that Pixie, not Sexton, orchestrated Joel's murder. The defense used the evidence that Pixie smothered her own child to demonstrate that Pixie was capable of murder and that Pixie had a motive to have Joel killed because she was fearful that Joel would implicate her in the death of the child. Therefore, as we found following the original trial, we again find that *930 the evidence surrounding the death of Skipper Lee Good was relevant in the retrial.
Finally, Sexton contends that even if the evidence of the baby's death was relevant, the State should not have been allowed to present details of the death and burial of the infant. In addition to being procedurally barred, the testimony relating to the death and burial of the infant did not become the focal point of the trial. See Finney v. State, 660 So.2d 674, 683 (Fla. 1995) (holding that the collateral crime evidence was not unduly prejudicial because the testimony did not become the focal point of the proceedings). Steve Ready of the Stark County, Ohio, Sheriff's Office testified that he went along with Detective John King of the Hillsborough County Sheriffs Office to Hillsborough River State Park to recover the infant's body. Both Ready and King testified that Charles pointed out the location of the infant's body. In addition, both Pixie and Willie testified about the events leading up to the death of the infant and Joel's desire to return to Ohio with the dead infant so that the infant would have a proper burial. Willie briefly testified that prior to burying the baby, Sexton drew a picture of a star on the ground, laid the baby in the middle of the star, and proceeded to recite "weird words." Despite Sexton's assertions, there were no graphic details of the infant's death or burial and the evidence surrounding the death of the infant was not a focal point of the trial.
In summary, this Court recognized the relevance of the baby's death in its prior decision in Sexton, 697 So.2d at 837. Thus, even if this claim were not procedurally barred, we reject it on the merits.

SEXTON'S REQUEST FOR NEW COUNSEL
In his second issue on appeal, Sexton contends that the trial court erred in failing to adequately address Sexton's request for new counsel. To put this issue in perspective, we begin by noting that one month before trial, on July 15, 1998, the trial court heard the State's motion suggesting a possible conflict of interest with Sexton's attorney, Rick Terrana.[7] During that hearing, Sexton specifically stated that he wanted to waive any alleged conflict so that he could retain his current attorney to represent him in his first-degree murder trial.
On August 24, 1998, a week before trial, the court held a subsequent hearing. At the beginning of the hearing, Sexton presented the court with a handwritten letter in which Sexton requested new counsel. The gist of the letter is that Sexton expressed general dissatisfaction with the trial preparation of his lawyers and asked the Court "to delay my trial until I can be given an attorney or attorneys that I will have confidence in to represent me." During an oral exchange with the trial court, Sexton again stated that he lacked "confidence" in his lawyers and asked that the letter be part of his record. The trial court explained that he could not replace court-appointed lawyers solely because clients lacked confidence in them. Sexton then replied that he wanted the letter placed in the record "for appellate purposes."
In Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988), this Court *931 adopted the procedure announced in Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973), to be followed when a defendant complains that his or her appointed counsel is incompetent. "When this occurs, the trial judge is required to make a sufficient inquiry of the defendant to determine whether or not appointed counsel is rendering effective assistance to the defendant." Howell v. State, 707 So.2d 674, 680 (Fla.1998). As a practical matter, however, the trial judge's inquiry can only be as specific as the defendant's complaint. See Lowe v. State, 650 So.2d 969, 975 (Fla.1994). This Court has consistently found a Nelson hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made. See Davis v. State, 703 So.2d 1055, 1058-59 (Fla.1997); Gudinas, 693 So.2d at 962 n. 12; Branch v. State, 685 So.2d 1250, 1252 (Fla.1996). Similarly, a trial court does not err in failing to conduct a Nelson inquiry where the defendant merely expresses dissatisfaction with his attorney. See Davis, 703 So.2d at 1058-59; Branch, 685 So.2d at 1252; Dunn v. State, 730 So.2d 309, 311-12 (Fla. 4th DCA 1999).
In the present case, it does not appear that Sexton made a formal allegation of incompetence entitling him to a Nelson hearing. In considering the propriety of failing to conduct a more extensive inquiry, we note that a month before trial, at a prior hearing on the State's motion suggesting a possible conflict by Sexton's attorney before the same trial court, Sexton expressly stated that he wanted to waive any alleged conflict so that he could retain his current attorney. Accordingly, because Sexton was merely noting his disagreement with his attorney's trial strategy and preparation and was not asserting a sufficient basis to support a contention that his attorney was incompetent, we find this point on appeal to be without merit.

VICTIM IMPACT TESTIMONY
The third point raised by Sexton is that the trial court erred in the admission of victim impact testimony. Prior to trial, Sexton filed a motion to limit the number of witnesses who would provide victim impact testimony, to seek pretrial determinations on the admissibility of such testimony, and to videotape the presentation of victim impact testimony to better provide for appellate review of the evidence.[8] At a pretrial hearing on the matter, the State suggested having the witnesses provide their statements in writing to the trial court, which in turn could edit the statements within the parameters of the law. The witnesses would then read their statements to the jury during the penalty phase of the trial. The trial court agreed to use this procedure and granted Sexton's motion to limit victim impact evidence.
Before the penalty phase of the trial began, written statements from Joel's family members were submitted to the trial court. After reviewing the family members' written statements, the trial court removed portions of their testimony in an effort to conform their testimony to the requirements of the law.
During the penalty phase, the State presented two of Joel's relatives, Teresa Boron and Asby Barrick, for purposes of providing victim impact testimony. Defense counsel did not object when the witnesses read their prepared statements. However, at the conclusion of Boron's testimony, defense counsel moved for a mistrial based partially on the fact that Boron wept during her testimony and because there was an impermissible reference to the first trial.
*932 On appeal, Sexton now contends that it was error to admit victim impact testimony that erroneously focused on the death of Joel's deceased infant, Skipper Lee Good, and offer the witnesses' opinions of the killings rather than testify solely to Joel's uniqueness as an individual and the community's loss from his death. We agree with the State that this issue is procedurally barred.
The failure to contemporaneously object to a comment on the basis that it constitutes improper victim testimony renders the claim procedurally barred absent fundamental error. See, e.g., Norton v. State, 709 So.2d 87, 94 (Fla.1997); see also Chandler v. State, 702 So.2d 186, 191 (Fla.1997). In Burns v. State, 699 So.2d 646, 653-54 (Fla.1997), this Court ruled that a defendant's challenge to victim impact testimony on the basis that it was unduly prejudicial was procedurally barred because the defendant did not raise this specific objection at trial. Moreover, in Norton, this Court determined that a defendant's motion for a mistrial at the conclusion of a witness's testimony was insufficient to preserve the witness's impermissible comment for appellate review. 709 So.2d at 94.
Sexton's claim that the State witnesses provided improper victim impact testimony was not preserved for appellate review because defense counsel failed to contemporaneously object during the testimony of either Boron or Barrick. Furthermore, even if the motion for a mistrial at the conclusion of Boron's testimony was sufficient for preservation purposes, defense counsel did not request the mistrial on the grounds now raised on appeal. See Burns, 699 So.2d at 653-54. Rather, defense counsel moved for a mistrial arguing that Boron wept during her testimony and made an improper reference to Sexton's first trial. Accordingly, because Sexton did not properly preserve the issue for appellate review, Sexton's claims pertaining to the victim impact testimony are procedurally barred unless the victim impact testimony constitutes fundamental error.
On the merits, section 921.141(7), Florida Statutes (1995),[9] allows the State to introduce "victim impact" evidence, which shows "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." Damren v. State, 696 So.2d 709, 712-14 (Fla.1997); see Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996); Windom v. State, 656 So.2d 432, 438-39 (Fla.1995); see also Payne v. Tennessee, 501 U.S. 808, 821-26, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
Although the United States Supreme Court and this Court have ruled that victim impact testimony is admissible, such testimony has specific limits. Those witnesses providing victim impact testimony are prohibited from giving characterizations and their opinions about the crime. See Payne, 501 U.S. at 826-27, 111 S.Ct. 2597; see also § 921.141(7), Fla. Stat. (1995) ("Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.").
Addressing the admissibility of victim impact testimony in Windom, this Court ruled that a police officer's victim impact testimony in which the officer testified about the effect of the victim's death on children in the community, other than the victim's two sons, was erroneously admitted *933 because it was not limited to the victim's uniqueness and the loss to the community's members by the victim's death. 656 So.2d at 438. The Court, however, found this evidence harmless in light of the strong aggravating circumstances and lack of mitigation in the record. See id. at 438-39 (citing State v. DiGuilio, 491 So.2d 1129 (Fla.1986)). Similarly, in Alston v. State, 723 So.2d 148, 160 (Fla.1998), the defendant alleged that the trial court erred in permitting victim impact testimony because the testimony by the victim's mother exceeded the scope of testimony allowed under Payne. The Court found that this testimony was harmless beyond a reasonable doubt "given the strong case in aggravation and the relatively weak case for mitigation." Alston, 723 So.2d at 160.
In the present case, Joel's aunt, Teresa Boron, provided victim impact testimony during the penalty phase of trial. She prepared a statement describing Joel's uniqueness as an individual and the loss to the community as a result of his death. Sexton contests the portion of Boron's testimony in which she made reference to the death of the infant, Skipper Lee Good, and offered her own characterizations and opinions about the infant's death: "[Joel's brother] will never get to play catch with the only nephew he will ever have because Skipper's life was also taken in a senseless act of violence."
We agree that the testimony relating to the death of the infant and Boron's characterizations and opinions about the murder of the child exceeded the scope of victim impact testimony as provided by section 921.141(7), because Boron did not limit her testimony to Joel's "uniqueness as an individual human being and the resultant loss to the community's members by" Joel's death. However, even if it had been preserved by proper objection, we would find this testimony harmless beyond a reasonable doubt. See Alston, 723 So.2d at 160; Windom, 656 So.2d at 438.
First, although Boron's testimony about the death of the infant may have been moving, jurors were already familiar with the circumstances surrounding the baby's death. In Payne, Justice O'Connor concluded that the defendant's due process rights were not violated when a victim impact witness provided moving testimony about the facts of the crime. 501 U.S. at 832, 111 S.Ct. 2597 (O'Connor, J., concurring). According to Justice O'Connor, "In light of the jury's unavoidable familiarity with the facts of Payne's vicious attack, I cannot conclude that the additional information provided by [the victim impact witness's] testimony deprived petitioner of due process." Id. Similarly, in the present case, although Boron may have improperly provided testimony about the death of the infant, jurors were already familiar with the events and circumstances surrounding the infant's death. Thus, given the jurors' familiarity with the death of the infant, any improper comments during the victim impact testimony would not rise to the level of fundamental error.
Second, in light of the three aggravators and the fact that the testimony regarding the effect of the infant's death on the surviving relatives was brief and not made a focus of the penalty phase, we further find that not only did the error not rise to the level of fundamental error, it was harmless beyond a reasonable doubt. See Alston, 723 So.2d at 160; Windom, 656 So.2d at 438. Nevertheless, we caution that any victim impact evidence must conform strictly to the parameters of the statute and our prior case law in order to avoid any potential danger of the testimony exceeding the purposes for which it is admissible.

SUFFICIENCY OF THE EVIDENCE
The parties did not specifically raise the issue of whether there was sufficient evidence to convict Sexton of first-degree murder. Nevertheless, it is this Court's independent obligation to review the record for sufficiency of evidence. See Brown v. State, 721 So.2d 274, 277 (Fla. 1998) (citing § 921.141(4), Fla. Stat. *934 (1997)). Upon our review of this record, in particular the testimony of several of Sexton's children, we find that there was competent substantial evidence to find Sexton guilty of first-degree murder. See Brown, 721 So.2d at 277.

PENALTY PHASE ISSUES
Finally, Sexton raises several claims with regard to the imposition of the death penalty. Sexton argues that his death sentence was unwarranted in this case because: (1) the trial court erred in the weight given to the aggravating circumstances; (2) Sexton was not more culpable than the perpetrator of the crime, Willie, who received a twenty-five-year prison sentence; (3) there was substantial mitigation in the record that renders the death sentence disproportionate; and (4) Florida's capital sentencing statute is unconstitutional because it authorizes the death penalty by a jury's bare majority vote.
As to Sexton's claims that the trial court erred in giving substantial weight to the prior violent felony and CCP aggravators, the weight to be accorded an aggravator is within the discretion of the trial court and will be affirmed if based on competent substantial evidence. See Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990). Although Sexton claims that the trial court gave too much weight to the prior violent felony aggravator because of the remoteness of the 1965 conviction, the trial court accorded "little weight" to the prior violent felony aggravator and therefore the trial court did in fact discount this prior felony because of its age. We find that there is competent substantial evidence supporting the finding of the prior violent aggravating circumstance and that the trial court did not abuse its discretion by affording the aggravator "little weight."
As to the CCP aggravator, Sexton claims that the trial court should not have given that aggravator much weight because Sexton's significant mental illness prevented him from planning or orchestrating the murder. As stated in Larkins v. State, 739 So.2d 90, 95 (Fla.1999), the CCP aggravator is one of the "most serious aggravators set out in the statutory sentencing scheme." Although the trial court found the statutory mitigating circumstance of "under the influence of extreme mental or emotional disturbance" at the time of the killing and afforded this mitigator "great weight," nothing in the expert testimony presented suggests that Sexton was incapable of planning Joel's murder and manipulating his children to assist with the murder and the disposal of the victim. Rather, the evidence showed that Sexton had the ability to know that killing Joel was wrong and had the ability to control his children to implement his plan. According to the trial court's sentencing order, the CCP aggravating circumstances was supported by the following evidence:
Focusing on the manner in which the crime was executed the defendant's weapon of choice was Willie Sexton. A method or process of putting a person "to sleep" by the use of a rope placed around the neck and then twisted tight with a stick was explained and demonstrated to Willie by the defendant. It was often discussed between them in the 2-3 weeks preceding the killing. The defendant was his coach and Willie demonstrated the process for the defendant and others. After encouraging Willie to believe Mr. Good to be a dangerous potential informant and threat to the Sexton family, the defendant convinced Willie that the best way to dispose of Mr. Good would be to "put him asleep." On the morning of the day of the killing the defendant told Willie that this was the day he needed to put Mr. Good "to sleep" and a spot in the nearby woods to which the victim would be enticed was suggested as the place to do it.... [Willie] and others testified that the defendant was actually present at the critical moment when the strangulation began to, and did, cause death, encouraging Willie to "finish him off." *935 Willie testified that he understood that he had killed Mr. Good and that he did it simply because his father, the defendant, ordered him to do it. The evidence establishes, beyond a reasonable doubt, heightened premeditation, lengthy and careful planning and prearrangement and an execution-style killing.
We not only find that competent substantial evidence supports the existence of the CCP aggravator, but also that the trial court did not abuse its discretion by affording it "great weight."
Turning to Sexton's argument that the death penalty is disproportionate, as we have often stated, the death penalty is reserved "for the most aggravated and unmitigated of most serious crimes." Clark v. State, 609 So.2d 513, 516 (Fla. 1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). This Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). "It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990).
When a codefendant is equally as culpable or more culpable than the defendant, the disparate treatment of the codefendant may render the defendant's punishment disproportionate. See Larzelere v. State, 676 So.2d 394, 406 (Fla.1996). Sexton claims that his death sentence should be reversed because he is not more culpable than the perpetrator of the crime, Willie, who received a sentence of twenty-five years in prison. Nonetheless, if the defendant is the more culpable participant in the crime, disparate treatment of the codefendant is justified. See id. at 407. "A trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence." Puccio v. State, 701 So.2d 858, 860 (Fla.1997).
The trial court's thorough analysis indicates that the trial court carefully considered the relative culpability of Sexton and Willie. See Jennings v. State, 718 So.2d 144, 153 (Fla.1998). As indicated by the trial court's sentencing order, the evidence established beyond a reasonable doubt that Sexton was the dominating force behind the murder of Joel and that he was far more culpable than Willie, the actual perpetrator of the homicide. According to trial court's detailed sentencing order:
The state's theory of prosecution was that the defendant so totally dominated, controlled and directed every facet of Willie Sexton's life that Willie would kill at his father's direction. In addition, the evidence showed that Willie is a dullwitted, childlike person who was 22 years old at the time of the killings. Further, the state urged as a motive for the killing that Joel Good was believed by the defendant to be about to reveal to law enforcement the defendant's whereabouts (he was a fugitive from Ohio) and criminal activity (he was implicated in the death and burial of an infant and had engaged in illicit sex with his daughters).
. . . .
This court is sensitive to the issue of proportionality of sentence in this case. The actual killer, Willie Sexton, has received a sentence of 25 years imprisonment after pleading guilty to the reduced charge of second-degree murder. This is not, however, merely a case of a son killing because his father wanted him to.
Florida case law is cleara defendant may not be sentenced to death if a more culpable co-defendant has been sentenced *936 to life imprisonment or less. This reasoning probably also extends to equally culpable co-defendants. This court believes the defendant to be the more culpable of the two co-defendants.
Willie Sexton had nothing to gain, and the defendant had everything to gain, from the death of Joel Good. This killing was solely the idea of the defendant however tormented his thought process was.
The evidence clearly showed the dominance of the defendant over his simpleminded son achieved by a lifetime of cruel, insidious and humiliating physical, emotional and sexual abuse. As in another Hillsborough County case, Witt v. State, 342 So.2d 497 (1977), the co-defendant was peculiarly susceptible to domination. Willie was the son. Willie was much younger. Willie is childlike mentally and emotionally. The defendant clearly dominated the criminal episode. For these reasons and after considering the totality of the circumstances and comparing this case to other capital cases this court submits that the sentence of death is proportional.
The trial court's findings were established by the testimony of the Sexton children and by the compelling expert testimony. We find that the trial court's ruling that Sexton was far more culpable than his son Willie is supported by competent substantial evidence. Thus, Willie's twenty-five-year prison sentence does not render Sexton's death sentence disproportionate.
Comparing the circumstances of this case to other cases in which the death penalty has been imposed, see Urbin, 714 So.2d at 416-17, Sexton's death sentence is proportionate to other cases where "masterminds" have been sentenced to death, even though they did not actually commit the murder. See Larzelere, 676 So.2d at 407; Fotopoulos v. State, 608 So.2d 784, 792-94 (Fla.1992).
In light of the circumstances of this crime, including the existence of the CCP and avoiding arrest aggravators, we find the imposition of the death penalty to be proportionate when compared to other similar cases. See Larzelere, 676 So.2d at 407; Fotopoulos, 608 So.2d at 792-94. In fact, we find the circumstances in this case to be even more egregious than these cases. Here, the record reflects that Sexton, on numerous occasions, indicated to Willie that Joel needed to be "put to sleep" and directed how this should be accomplished. Sexton ruthlessly utilized his own simple-minded and abused son as his murder weapon of choice to kill Joel and to avoid detection by authorities. In addition, Sexton was present for at least part of the murder and may have actually participated in the killing.
In affirming Sexton's death sentence, we do not overlook the fact that the trial court gave great weight to the statutory mitigator of "under the influence of extreme mental or emotional disturbance." We set forth the trial court's reasoning as to this mitigator in order to put the court's finding in proper perspective:
Two psychologists, Dr. Weiner and Dr. Wood, examined the defendant. Dr. Weiner's testing of the defendant revealed an I.Q. in the low 80s and showed large differences between his abilities in different measures. His scores on some tests ranged from 16 percentile to 2 percentile suggesting some kind of brain dysfunction. Dr. Weiner recommended a Positron Emission Tomography (PET) scan and that was administered by Dr. Wood. According to Dr. Wood it revealed a dysfunctional limbic system in the lower half of the brain. An MRI examination conducted on the defendant following an auto accident in 1991 showed structural injury on the top half of his brain as well. Dr. Wood opined that, as a result, the defendant does not respond normally to emotional situations and has memory deficits confining his functions to the present moment without a continuity of information from the past that normal people have. Dr. Weiner opined that the defendant had a `rather *937 limited tolerance for stress' tending to diminish his self control below the normal level of expectation.
The anecdotal evidence of exceedingly bizarre episodes and incidents too numerous to include herein, considered together with the evidence of brain dysfunction shows a man with low-normal intelligence and inability to cope placed under the stress of losing his children to the Ohio authorities and turning desperate.
Although the trial court found the evidence established this statutory mitigator, this finding did not obviate the CCP aggravator, indicating Sexton's capability of planning and directing the murder of his own son-in-law for purposes of avoiding arrest. See Cruse v. State, 588 So.2d 983, 992 (Fla.1991) (finding that the defendant's advance procurement of weapon and ample time for reflection supported CCP notwithstanding finding that defendant acted under extreme mental or emotional disturbance). The trial court here found the statutory mitigator to be applicable because of the fact that as a result of brain dysfunction, Sexton does not respond normally to emotional situations and that he had turned "desperate" as a result of the stress of losing his children. The trial court properly evaluated and weighed this statutory mitigator and considered it in light of the statutory aggravators, including CCP and avoiding arrest. Considering the existence of three statutory aggravators in this case, the quality of both the statutory and nonstatutory mitigation and the circumstances of the murder in this case, we find this death sentence to be proportionate. Cf. Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996) (affirming defendant's death sentence for killing his wife based on the presence of two aggravating factorsprior violent felony and HACdespite the existence of two statutory mental mitigatorsextreme mental or emotional disturbance and impaired capacity to appreciate the criminality of conduct, as well as a number of nonstatutory mitigating circumstances); Heath v. State, 648 So.2d 660, 666 (Fla.1994) (affirming defendant's death sentence based on the presence of two aggravators-prior violent felony and murder committed during the course of a robberydespite the existence of the statutory mitigator, extreme mental or emotional disturbance); Lemon v. State, 456 So.2d 885, 888 (Fla.1984) (upholding imposition of the death penalty where defendant was convicted of stabbing a woman and the trial court found two aggravating factors-HAC and a prior violent felony conviction-and one mitigating factor, emotional disturbance).
For his final claim, Sexton attacks the constitutionality of Florida's capital sentencing statute, which authorizes a death sentence recommendation by a bare majority vote. This argument has been previously rejected by this Court. See, e.g., Larzelere, 676 So.2d at 407 n. 7; Hunter v. State, 660 So.2d 244 (Fla.1995) (citing James v. State, 453 So.2d 786, 792 (Fla.1984)). In addition, this was not a bare majority vote case because the jury recommended the death penalty by a vote of eight to four.
Accordingly, we affirm the conviction and sentence of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] As noted in this Court's opinion in Sexton, 697 So.2d at 834-35, Willie was named a codefendant in Joel's death in the first trial but was later found incompetent to stand trial.
[2] DHS had Sexton's six youngest children removed from the home in 1992. Several months later, three of the children were returned to Sexton's wife, Mrs. Sexton, but Sexton was ordered to have no contact with the children or with Mrs. Sexton. Following a hearing on the matter in November 1992, Sexton barricaded himself and his family in their home demanding the immediate return of his three children who remained in foster care. Sexton threatened to kill anyone from Child Protective Services or the police department who tried to take his children. Eventually, Sexton turned himself in to the authorities. A search of the Sexton residence revealed a .357 revolver, a 20-gauge shotgun, and seventy rounds of ammunition. After his release, the Sextons failed to appear at a scheduled court hearing. Arrest warrants were issued for Sexton and his wife in October 1993.
[3] In exchange for a plea to manslaughter and testimony against Sexton, Pixie was sentenced to twelve years imprisonment.
[4] On cross-examination, Willie admitted that he previously had told different versions of the events surrounding the murder of Joel. According to Willie, he told different versions of the murder because he feared Sexton and because he wanted to get back at Sexton for all of the bad things that Sexton did to him.
[5] Sherri testified for the defense in the first trial, see Sexton, 697 So.2d at 835, but did not testify in this trial.
[6] The State's medical examiner, Doctor Marie Hermann, confirmed portions of Willie's testimony. According to Dr. Hermann, who assisted in the recovery of Joel's body and performed the autopsy, she observed a deep wound on the victim's right hand that was caused by a sharp instrument with great amount of force. The wound was consistent with an attempted dismemberment of the right hand. Dr. Hermann also observed that, upon recovery of Joel's body, there was a ligature device around Joel's neck. Dr. Hermann opined that the cause of death was asphyxiation as a result of ligature strangulation.
[7] In addition to being charged with first-degree murder, Sexton was also charged in a separate criminal information with one count of conspiracy to commit first-degree murder. Sexton subsequently pled guilty to the charge and was sentenced to thirty years in prison. However, on July 13, 1998, Sexton filed a motion for postconviction relief in which he argued that his guilty plea to conspiracy was involuntary because the plea was made based upon a reasonable expectation from the trial court and defense counsel that Sexton would receive a guidelines sentence. Prior to Sexton's first-degree murder trial, the State alleged that Sexton's attorney, Rick Terrana, could potentially be placed in a conflicting position by defending Sexton in the first-degree murder trial, while also being required to testify in a manner potentially adverse to Sexton's interests in the conspiracy case.
[8] Although the trial court initially granted Sexton's request to videotape the testimony, the trial court subsequently reversed its ruling when it decided to have the witnesses read prepared statements that could be edited and reviewed by both the State and Sexton. Accordingly, we reject Sexton's claim that it was an abuse of discretion to deny his request to videotape the victim impact testimony.
[9] Section 921.141(7), Florida Statutes (1995), provides:

Victim impact evidence.Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.