547 So.2d 111 (1989)
Edward CASTRO, Appellant,
v.
STATE of Florida, Appellee.
No. 71982.
Supreme Court of Florida.
July 13, 1989.
Rehearing Denied September 1, 1989.
*112 James B. Gibson, Public Defender, and Michael S. Becker, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Carolyn N. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Edward Castro appeals his convictions of first-degree murder and robbery with a deadly weapon. He also appeals the sentence of death and the five-and-one-half-year sentence imposed for the robbery. Our jurisdiction is mandatory.[1] We affirm the convictions but remand for a new sentencing hearing before a jury.
Castro lived in a small efficiency located in the rear of an Ocala apartment house. On January 10, 1987, he met Robert McKnight, who had just hitchhiked to Ocala from Iowa, and invited him to his apartment for a drink. At trial, McKnight testified that while at Castro's apartment, Castro had "ripped up a sheet[,] ... tied my hands and gagged me[,] and was standing over the bed ... asking me where I wanted to be stabbed." In his hand Castro held a steak knife. McKnight was released upon the arrival of John Gallagher, the man with whom Castro shared the apartment. McKnight, nevertheless, stayed with Castro for four days before moving to an upstairs apartment.
On the morning of January 14, when McKnight returned to the apartment to retrieve his clothes, he met Castro and an older man, Austin Scott, leaving the apartment. As Castro passed, he said to McKnight, "this is my hit," whereupon Castro and Scott left in Scott's car to buy beer.
Sometime later that morning, Castro invited McKnight downstairs "to be sociable." Upon arrival, McKnight found the door to Castro's apartment locked. When Castro admitted him, he saw that Scott was dead and that Castro's arms were covered with blood. McKnight testified that Castro then ordered him to pick up the steak knife and stab Scott or "I'd be next." McKnight obeyed and stabbed Scott four or five times in the chest, following which they wiped the blood from the apartment and removed Scott's wallet, change, rings and watch.
Castro and McKnight then left Ocala in Scott's car, heading toward Lake City. During the journey, Castro became "pretty well intoxicated" from drinking the vodka and whiskey which he had found in the trunk. The trip was interrupted when Castro *113 was arrested[2] at a gas station for disorderly intoxication due to his belligerence toward two deputy sheriffs.
While in the holding cell at the jail, Castro indicated to the officer on duty that he had something to tell him which would "put a stripe on [his] sleeve" and asked to see an investigator. Investigator Kay Gallegos responded and after Castro was advised of his Miranda[3] rights he gave the first of three separate statements detailing the circumstances of the killing.
The jury found Castro guilty as charged. During the penalty phase, the state did not put on any evidence and Castro's sole witness was Dr. Barbara Mara, a clinical psychologist. The jury recommended the death penalty and the trial court concurred, finding three aggravating circumstances,[4] two mitigating circumstances,[5] and rejecting two other potential mitigating circumstances.[6]
Castro asserts nine grounds for relief. Challenging the guilt phase, Castro first contends that because the trial court ruled that his initial statement to the corrections officer at the jail was inadmissible for lack of a Miranda warning, all of the subsequent statements he gave to Investigator Gallegos, Lieutenant Nydam, and Investigator Leary should also have been suppressed. The trial court, Castro argues, failed to find that the statements were voluntary.
At the outset, we note that the trial court's decision to exclude Castro's first statement due to the state's failure to properly warn Castro of his rights did not automatically obligate the trial court to suppress Castro's three subsequent statements. In Oregon v. Elstad, 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985), the Court found that
absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.
In determining the voluntariness of Castro's subsequent statements, the trial court was required to consider the surrounding circumstances. See Elstad, 470 U.S. at 318, 105 S.Ct. at 1297-98; Bauza v. State, 491 So.2d 323, 324 (Fla. 3d DCA 1986). Voluntariness in this context depends upon the absence of "coercive police activity," or "overreaching." Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).
Consistent with the principles underlying Elstad, the trial court below held a pretrial evidentiary hearing on Castro's motion to suppress. The testimony established that officers gave Castro verbal Miranda warnings and that he executed written waiver forms on two of the three occasions in question. We are satisfied that the testimony was sufficient to support the conclusion that the confessions were voluntary and not influenced by Castro's previous consumption of alcohol.
*114 We likewise find no merit to Castro's assertion that the convictions must be reversed because the jury propounded a request in the absence of counsel or the defendant to rehear certain testimony. The record reflects that counsel stipulated that the judge could discuss the luncheon arrangements with the jury in counsel's absence. During this colloquy, the foreman asked to have McKnight's testimony reread upon return from lunch. The trial court correctly deferred ruling on the request and gave both parties the opportunity to respond when court reconvened. See Fla.R.Crim.P. 3.410; Roberts v. State, 510 So.2d 885, 891 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 1123, 99 L.Ed.2d 284 (1988). Both parties objected to replaying the testimony, whereupon the court instructed the jury to rely on its collective memory.
We also reject the contention that the trial court abused its discretion in failing to grant Castro's requests for additional peremptory challenges and for special interrogatory verdicts.
Castro next asserts that his conviction warrants reversal because the trial court erroneously admitted testimony which was irrelevant and prejudicial. First, Castro argues that the testimony of Officer Greg Stewart, who analyzed the blood spatter patterns on the walls and ceiling of Castro's apartment, should have been excluded because Officer Stewart could not connect the stains to the murder. Although Officer Stewart could not confirm that the bloodstains on the walls and ceiling were Scott's, he was able to determine that the spatters were created by a front-to-rear motion which originated from a source in the front of the room not exceeding three feet from the floor. That testimony was logically relevant to the testimony offered by the crime lab analyst, who testified that the stains identified by Officer Stewart were of human blood and not inconsistent with the blood of Mr. Scott. In addition, the spatter evidence was consistent and tied in with other evidence detailing the manner of the crime. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence will not be disturbed. Blanco v. State, 452 So.2d 520, 523 (Fla. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985). We find no error on this point.
We do agree, however, that the court erred in admitting the testimony of William Kohler. William Kohler was an owner of the apartment house where the murder occurred and was permitted to testify that several days after the murder he found a steak knife outside Castro's apartment building. There is no question that the knife found by Kohler was irrelevant. It was undisputed that Castro had broken the murder weapon into pieces and thrown it out the window during the trip to Lake City.
Likewise, the trial court erred in admitting McKnight's testimony that Castro had tied him up and threatened to stab him several days prior to killing Scott. This evidence violated the dictates of Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). In State v. Lee, 531 So.2d 133, 135 (Fla. 1988), we considered Williams and said that
[e]vidence of collateral crimes or acts committed by the defendant is inadmissible if its sole relevancy is to establish bad character or propensity of the accused. Williams v. State ... . Evidence of other crimes or acts is admissible, however, "if it casts light upon the character of the act under investigation by showing motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of the prior offenses would have a relevant or a material bearing on some essential aspect of the offense being tried." Id. at 662. See § 90.404(2)(a), Fla. Stat. (1983). The test for admissibility of evidence of collateral crimes is relevancy. Heiney v. State, 447 So.2d 210, 213 (Fla.), cert. denied, 469 U.S. 920 [105 S.Ct. 303, 83 L.Ed.2d 237] (1984).
That is to say, similar fact evidence which tends to reveal the commission of collateral *115 crimes is admissible if it is relevant to a material fact in issue, except where the sole relevance is the character or propensity of the accused.
The rationale underlying the Williams rule is that such evidence
"would go far to convince men of ordinary intelligence that the defendant was probably guilty of the crime charged. But, the criminal law departs from the standard of the ordinary in that it requires proof of a particular crime. Where evidence has no relevancy except as to the character and propensity of the defendant to commit the crime charged, it must be excluded."
Jackson v. State, 451 So.2d 458, 461 (Fla. 1984) (quoting Paul v. State, 340 So.2d 1249, 1250 (Fla. 3d DCA 1976), cert. denied, 348 So.2d 953 (Fla. 1977)). For this reason, we have held that the erroneous admission of irrelevant collateral crimes evidence "is presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged." Straight v. State, 397 So.2d 903, 908 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981). Accord Peek v. State, 488 So.2d 52, 56 (Fla. 1986).
In this case McKnight's testimony was inadmissible because it lacked relevance to any material fact in issue. We reject the state's contention that McKnight's testimony was relevant to demonstrate McKnight's state of mind in accompanying Castro to Lake City and in obeying Castro's order to stab Scott. The record discloses that McKnight's state of mind was never in issue. Therefore, testimony to establish his mental state was irrelevant. As the state itself argued in its closing, Castro never implicated McKnight in any statement and in fact specifically exonerated him of any responsibility for the murder. The only discernible purpose for this testimony was to show a bad character and propensity for violent behavior. Accordingly, we find that this evidence was erroneously admitted.
Because we find error, we must consider whether the state has met its burden of showing that the error here can be deemed harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986). As we have noted above, the improper admission of this irrelevant collateral crimes evidence is presumptively harmful. Peek, 488 So.2d at 56; Straight, 397 So.2d at 908. Moreover, we recognize that it is not enough to show that the evidence against a defendant was overwhelming. Error is harmless only "if it can be said beyond a reasonable doubt that the verdict could not have been affected by the error." Ciccarelli v. State, 531 So.2d 129, 132 (Fla. 1988) (emphasis supplied).
On this record, we are persuaded that as to Castro's convictions, this stringent test has been met as to the testimony of both Kohler and McKnight. The most incriminating evidence against Castro was his own confession. Castro gave an account of the murder on three different occasions admitting to having strangled and stabbed Mr. Scott. His theory of defense at trial was that one of McKnight's five stab wounds constituted the fatal blow. In light of the totality of the evidence, including Castro's own confession, we must conclude that the admission of McKnight's testimony could not have affected the outcome of the guilt phase. With or without the error, the jury could have reached no conclusion other than that Castro was guilty. Thus, the presumption of harmfulness that accompanies a Williams rule error of this type has been rebutted by the state as it affects the guilt phase.
We are not persuaded, however, that McKnight's testimony about his experience with Castro was equally harmless as to the death sentence. Substantially different issues arise during the penalty phase of a capital trial that require analysis qualitatively different than that applicable to the guilt phase. What is harmless as to one is not necessarily harmless as to the other, particularly in light of the fact that a Williams rule error is presumed to infect the entire proceeding with unfair prejudice. Peek, 488 So.2d at 56; Straight, 397 So.2d at 908.
*116 While the guilt phase asks the jury to determine whether the defendant committed the crime charged, the penalty phase asks the jury to recommend whether that defendant should be put to death or spend life in prison. This recommendation must be based upon a weighing of aggravating and mitigating factors that may properly be inferred from any of the evidence, including that which has been introduced during the guilt phase. In the present case, for instance, the state did not present a separate case during the penalty phase. The prosecutor stated:
Your Honor, at this time the State would proffer all of the evidence, both testimonial and by way of exhibits, that was admitted in the first phase, in support of the State's position on the aggravating circumstances in the second phase.
Once the jury has received penalty phase evidence and made a life recommendation, for the trial court to then reject that recommendation and impose a sentence of death, "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). Under those circumstances, unless the state can prove that "there is no reasonable possibility that the error [complained of] contributed to the conviction," DiGuilio, 491 So.2d at 1138 (citation omitted), the error cannot be deemed harmless. This is especially true where the error is presumptively harmful, such as a Williams rule violation. Peek, 488 So.2d at 56; Straight, 397 So.2d at 908.
Based on the record before us, we cannot say that the state has proven beyond a reasonable doubt that the improper testimony could not have affected the penalty phase determination. The jury heard that Scott and Castro had been drinking during the morning prior to the murder. The jury heard from Dr. Mara, who diagnosed Castro as having an alcohol- and drug-addicted personality. Dr. Mara also testified that Castro had been victimized by a history of child abuse, especially incest, which began at the age of four and which might account for his bizarre thinking and aggressive behavior. The case for mitigation  that Castro was an alcoholic, addict, and victim  is very different from the image presented by McKnight's irrelevant and improper testimony  that Castro had an inherent criminal propensity and bad character. In sum, the Williams rule error improperly tended to negate the case for mitigation presented by Castro and thus may have influenced the jury in its penalty-phase deliberations. For this reason, we cannot say beyond any reasonable doubt that had the jury not heard McKnight's irrelevant, prejudicial testimony, it might not have determined that a life sentence was appropriate under the circumstances.
Moreover, we find additional error in the trial court's failure to instruct the jury that it might consider nonstatutory mitigating evidence in deciding the appropriate penalty. Before the jury retired to deliberate upon the penalty, defense counsel informed the trial court of its failure to give the standard jury instruction on nonstatutory mitigating evidence and requested that the court so instruct the jury. The trial judge refused at that point because he felt it would place undue emphasis upon the instruction. Thus, although mitigating evidence was presented, the jury was never instructed that it could consider it. The failure to so instruct the jury violated Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).
Accordingly, we vacate Castro's death sentence and remand with instruction that the trial court empanel a new jury and conduct a sentencing proceeding on the murder conviction. We find it unnecessary to address the remaining penalty phase issues. Finally, we find no merit to Castro's assertions regarding his sentence on the robbery count and affirm same.
It is so ordered.
OVERTON, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
EHRLICH, C.J., and McDONALD, J., concur in result only.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] McKnight was not detained and boarded a bus to Chicago where he told officers that he had information about the Ocala murder. He later pled guilty to the offense of accessory after the fact, received five years' probation, and testified for the state at Castro's trial.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] That the capital felony was a homicide committed in a cold, calculated, and premeditated manner; that it was "especially heinous, atrocious, [or] cruel;" and that it was committed while the defendant was engaged in the commission of a robbery.
[5] That the defendant was sexually abused as a child, creating an "anti-social personality," and that the defendant conditioned his confession on the receipt of psychiatric help.
[6] That the lighter sentence received by McKnight was disparate and that Castro consumed alcohol prior to the murder.