800 So.2d 182 (2001)
Steven Maurice EVANS, Appellant,
v.
STATE of Florida, Appellee.
No. SC95993.
Supreme Court of Florida.
October 11, 2001.
Rehearing Denied December 10, 2001.
*185 James B. Gibson, Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a sentence of death upon Steven M. Evans. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm both the conviction for first-degree murder and the death sentence.

Procedural and Factual Background
On April 26, 1996, Steven Maurice Evans (Evans), and his friends Edward Francis (Francis), Gervalow Ward (Ward), and Kenneth Lewis (Lewis), traveled from Orlando to commit a home invasion robbery of a purported drug dealer who lived in Sanford, Florida. The robbery was called off when Lewis abandoned the men and left in the getaway car, which was owned by Evans' girlfriend's brother. Stranded, Evans, Francis, and Ward went to the nearby home of Mark Quinn, an acquaintance of Evans. Evans called home and warned his girlfriend that Lewis might be *186 coming there. Evans also instructed her to call the police, report the car stolen, and remove money from the home because he believed Lewis was going to go back to the home and steal his money.
Evans, Francis, Ward, Quinn, and a man named Blaine Stafford (Stafford) then went to Evans' apartment to wait for Lewis to get there. Evans was acting agitated and strange. He was laughing and pacing and had a strange look on his face. When the men saw Lewis drive up to the apartment, they positioned themselves around the door. When Lewis entered the apartment, they jumped him and beat him. He was bound and gagged. At some point, the police arrived to investigate the reported stolen vehicle. Still bound and gagged, and at Evans' direction, Lewis was taken to a back room to wait with the other men until the police left.
After the police left, Evans directed one of the men to retrieve a shampoo bottle, and with it he made a homemade silencer by stuffing the shampoo bottle with plastic bags. He taped the bottle to the barrel of his gun. He instructed Ward to check the backyard for any witnesses. Evans, Francis, and Ward then marched Lewis to the back of the apartment building to a culvert where Lewis was pushed down. Evans told Lewis that they were the last three people he would leave behind, and they were the last three people he would see on this earth. Evans then put the gun with the homemade silencer to Lewis's head and shot him six times. Five of the shots entered Lewis's head.
Evans was convicted of premeditated first-degree murder, and the jury recommended a sentence of death by a vote of eleven to one. In the sentencing phase of the trial, Evans presented the following evidence in mitigation.
Evans was born out of wedlock. While his mother went to school, he was raised by his maternal grandparents until the age of six or seven. When she married, he moved in with his mother and stepfather, who raised him as a son. His parents were Jehovah's Witnesses. They had two more children, a son who was mentally impaired and a daughter. Evans was a devout Jehovah's Witness and cared for his mentally impaired brother and his sister. He participated with the Jehovah's Witnesses five days a week. He attended a public high school. When he was a teen, his stepfather accused him of masturbating and made him stand up in front of the congregation and ask for forgiveness. This evidence was apparently offered to show Evans was traumatized as a child and teen.
Evidence also indicated Evans experienced two head injuries as a child, one at the age of nine when he fell off his bike, and one at around the age of nineteen, when he was in a car accident. Sometime after the second injury, the family noticed a change in Evans' personality. Evans married around the age of eighteen or nineteen. There was at least one episode after he was married where his parents had to help his wife subdue him. Evans had gone out and apparently consumed alcohol, and when he returned he was out of control and ran down the street in his underwear. He has three children. Around the age of twenty-two or twenty-three, Evans committed adultery and was disassociated from the Jehovah's Witness congregation. From that point, there is no testimony about Evans' personal life and nothing else in mitigation. At the time of this crime, Evans was twenty-eight years old.
At the Spencer[1] hearing, Evans requested that no additional testimony or evidence *187 be presented in mitigation and requested that the trial court follow the jury's recommendation and impose a death sentence. The trial court followed the procedure mandated in Koon v. Dugger, 619 So.2d 246, 250 (Fla.1993), and reviewed all statutory and nonstatutory mitigating factors raised at the hearing, including all mitigating evidenced proffered pursuant to Koon.
Evans raises before this Court three guilt phase issues and five penalty phase issues. The three guilt phase claims are: (1) the trial court erred in finding Evans competent to stand trial; (2) the trial court erred in denying Evans' motion for mistrial after a State's witness referred to Evans' prior criminal record; and (3) the introduction of irrelevant and prejudicial evidence which the State could not tie to the crime denied Evans his constitutional right to a fair trial. The five penalty-phase claims raised are: (1) the trial court erred in finding that the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification where the finding is unsupported by the evidence; (2) the trial court erred in finding the aggravating circumstance of an especially heinous, atrocious, or cruel murder; (3) the trial court improperly balanced the aggravating factors against the mitigating factors; (4) under Florida law, the death penalty is disproportionate to the facts of this case; and (5) Evans' death sentence was grounded on a split jury vote of eleven to one and is therefore unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
For the reasons set forth below, we affirm both the judgment for first-degree murder and the sentence of death.

Guilt Phase Issues
Evans first claims the trial court erred in finding him competent to stand trial. We disagree and affirm the decision of the trial court. The standard for reviewing a competency issue is set out in Hunter v. State, 660 So.2d 244, 247 (Fla. 1995), which provides in pertinent part:
The test for whether a defendant is competent to stand trial is whether "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960); see also § 916.12(1), Fla. Stat. (1993); Fla. R.Crim. P. 3.211(a)(1). The reports of experts are "merely advisory to the [trial court] which itself retains the responsibility of the decision." Muhammad v. State, 494 So.2d 969, 973 (Fla.1986) (quoting Brown v. State, 245 So.2d 68, 70 (Fla. 1971), vacated in part on other grounds, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972)), cert. denied, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987). And, even when the experts' reports conflict, it is the function of the trial court to resolve such factual disputes. Fowler v. State, 255 So.2d 513, 514 (Fla. 1971). The trial court must consider all evidence relevant to competence and its decision will stand absent a showing of abuse of discretion. Carter v. State, 576 So.2d 1291, 1292 (Fla.1989), cert. denied, 502 U.S. 879, 112 S.Ct. 225, 116 L.Ed.2d 182 (1991).
In Hunter, this Court concluded that the trial court did not abuse its discretion in finding the defendant competent to stand trial. In so finding, we noted the evidence the trial court considered in making its determination. This evidence included the report and testimony of three experts, the report of another expert, and the court's own observations of the defendant's behavior in court. See also Hardy v. State, 716 *188 So.2d 761, 763 (Fla.1998) (concluding the trial court did not abuse its discretion in finding defendant competent to stand trial after examining expert testimony, testimony from jailhouse employees, and the trial court's own observations of the defendant).
In this case, the trial court considered similar evidence in making its competency determination. The issue of Evans' competency had been litigated for over one year, and the trial court had reviewed numerous reports from the three mental health experts.[2] In order for an expert's evaluation to constitute evidence adequate to support a trial court's competency determination, it must include a discussion of each of the specific factors which Florida Rule of Criminal Procedure 3.211(a) enumerates. See Livingston v. State, 415 So.2d 872 (Fla. 2d DCA 1982). A review of this record indicates that each doctor considered these factors when making each competency determination. Thus, these evaluations were properly relied upon by the trial court and can be used to support its competency determination. There is no evidence that the court ignored or disregarded the experts' opinions, and in fact the court on two prior occasions concluded that Evans was not competent to proceed with trial and had him hospitalized.
The experts' evaluations in this case were in conflict; two experts opined Evans was competent while another expert concluded he was not competent. Even when the experts' reports conflict, it is the function of the trial court to resolve such factual disputes, and the trial court's determination should be upheld absent an abuse of discretion. See Fowler v. State, 255 So.2d 513, 514 (Fla.1971). See also Turner v. State, 645 So.2d 444, 446 (Fla. 1994) ("Although there was conflicting evidence during the pretrial competency proceedings, the trial judge did not abuse his discretion in finding Turner competent to stand trial.")
After hearing testimony from the three experts, the trial court found Evans competent to stand trial. In addition, the trial judge had ample opportunity to observe Evans in the courtroom. Based on these factors, we find that the trial court did not abuse its discretion in finding Evans competent to stand trial.
Next, Evans claims the trial court erred in denying his motion for mistrial after a State witness referred to his prior criminal record. Contrary to the State's argument, this issue was properly preserved for appeal. While the witness was permitted to answer before objection, this court has held that "an objection need not always be made at the moment an examination enters impermissible areas of inquiry." Jackson v. State, 451 So.2d 458, 461 (Fla.1984). In Jackson, "objection was made during the impermissible line of questioning, which is sufficiently timely to have allowed the court, had it sustained the objection, to instruct the jury to disregard the testimony or to consider a motion for mistrial." Id. Here, the court considered defense counsel's motion for a mistrial during the line of questioning, and the issue was properly preserved for appeal despite the fact that the witness was allowed to answer the question.
Having found this issue properly preserved for appeal, we must determine *189 whether the trial court erred in denying Evans' motion for a mistrial. In Cole v. State, 701 So.2d 845, 853 (Fla.1997), we said, "A ruling on a motion for mistrial is within the sound discretion of the trial court. See Power v. State, 605 So.2d 856, 861 (Fla.1992). A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. Id." Evans claims that the witness's reference to "records of the Orlando Police Department" deprived him of a fair trial because the jury could conclude from that statement that he had a prior criminal record. Evans' claim is similar to an issue raised in Cole. The witness in Cole, in response to a question about how she came to see a receipt with the victim's name on it, stated, "I was nosey and knew some history on K.C., so I decided to go outside and look at the tag on the car." Id. The defense moved for mistrial on the ground that the witness was clearly referring to the defendant's prior criminal history. The trial court denied the defense's request for a mistrial, and this Court held that since the remark "was not so prejudicial as to require reversal," the trial court did not abuse its discretion. Moreover, this Court agreed that the reference was "isolated and inadvertent and was not focused upon." Id.
While the remark in the instant case is not as obscure as the remark in Cole, it was isolated and not focused upon. The prosecution was attempting to establish that Evans' fingerprints were found on the car used the night of the murder. To do so, the State's expert witness took fingerprints from Evans before she testified, compared these to his fingerprints on record with the Orlando Police Department, and concluded that the fingerprints were from the same man. Since the expert had previously determined that Evans' fingerprints on record matched the prints found on the car, she concluded that the prints she took that morning from Evans matched the prints on the car. The prosecutor explained this process as follows:
The purpose of the break was so that she could compare the ink prints she just took to the other ink prints. It would take several hours for her to re-compare the latent prints to the new inked prints. This is how she is able to identify that the prints she compared are, in fact, Mr. Evans. I don't think this implies anything improper vis-a-vis the defendant and it certainly wasn't intended to and I don't think that it does.
The trial court agreed and denied the defense's motion for a mistrial.
Moreover, any possible error resulting from this remark was cured by Evans' own testimony during the guilt phase of this trial. See Hernandez v. State, 763 So.2d 1144, 1145 (Fla. 4th DCA 2000) (where appellant claims the court erred in denying a motion for mistrial when oblique references were made to his prior criminal history, such error is completely harmless since appellant testified and admitted various criminal acts); Peak v. State, 363 So.2d 1166, 1168 (Fla. 3rd DCA 1978) ("As the defendant himself admitted on cross-examination at trial that he did in fact have a prior criminal record, we regard the inadvertent reference to the defendant's prior conviction as harmless."). On direct examination, Evans admitted that he had a prior felony conviction. On cross-examination, it was brought out that Evans was confused and actually had two prior convictions. Thus, in accord with the reasoning in Hernandez and Peak, any error that may have occurred was harmless because Evans himself admitted that he had a prior record.
Evans also claims this error was not harmless as to the penalty phase, relying *190 on Castro v. State, 547 So.2d 111 (Fla. 1989). In Castro, we found the trial court erred in admitting improper Williams[3] rule testimony, but that this error was harmless as to the guilt phase because with or without the error, the jury could have reached no other conclusion than that the defendant was guilty. Id. at 115. As to the penalty phase, however, we found:
[T]he Williams rule error improperly tended to negate the case for mitigation presented by Castro and thus may have influenced the jury in its penalty-phase deliberations. For this reason, we cannot say beyond any reasonable doubt that had the jury not heard McKnight's irrelevant, prejudicial testimony, it might not have determined that a life sentence was appropriate under the circumstances.
Id. at 116. In the Castro penalty phase the State did not present any additional evidence and did not argue any prior criminal record as an aggravating circumstance.
In the present case there is no evidence supporting the contention that the remark by the State's witness tended to negate the evidence Evans presented as mitigation during the penalty phase. Generally, Evans' mitigation evidence consisted of testimony from doctors as to his mental state and testimony from family members as to his reputation in the community and his relationship with the church. Evans did not assert that he had no prior criminal record. In fact, evidence of Evans' prior criminal record was before the jury: Evans testified to his prior conviction in the guilt phase, and the State introduced Evans' previous felony conviction into evidence in support of the aggravating factors of prior violent felony and under sentence of imprisonment. Thus, there is no support for the argument that the jury was influenced in the penalty phase by the witness's isolated remark in the guilt phase. We find the trial court did not abuse its discretion in denying Evans' motion for a mistrial.
Evans claims as his third guilt phase issue that the introduction of irrelevant and prejudicial evidence which the State could not tie to the crime denied him his constitutional right to a fair trial. "Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion." Ray v. State, 755 So.2d 604, 610 (Fla.2000); see also Alston v. State, 723 So.2d 148, 156 (Fla.1998).
First, Evans complains that the trial court erred in admitting the .22 caliber shell casing found in the car parked at the apartment. At trial, defense counsel renewed his objection to the shell casing on relevancy grounds. The State argued that the shell casing found in the car matched the shell casings found at the crime scene which supported witness testimony that the participants in the crime were involved with the car. The trial court admitted the shell casing found in the car.
Evans' claim that the State failed to prove the relevance of the shell casing is not supported by the evidence. The State presented testimony that the shell casing found in the car matched the shell casings found at the murder scene. The shell casing discovered in the car came from the gun used to kill Lewis. See Dornau v. State, 306 So.2d 167, 170 (Fla. 2d DCA 1974) (jury relied on evidence showing that shell casing found at the crime scene matched shell casings found at defendant's *191 business). This links Evans to the murder because his fingerprints were found on and inside the car, and there was testimony that Evans was in possession of the car during the night of the murder. Thus, the shell casing was relevant and was properly admitted.
Evans next complains that the trial court erred in allowing the jury to hear evidence that Evans was a member of a gang. The State asserts, however, that this testimony was relevant to show how these men knew each other. The relevancy of this testimony is questionable because the relationship between the men involved in the murder was not at issue in the trial. The relationship between Evans, Ward, Francis, and Lewis could have been established without comment on the gang or Evans' membership in the gang. Additionally, there was no issue concerning how these men came to know each other. Thus, the evidence was not relevant for either purpose.
However, any error in admitting evidence of Evans' gang membership was harmless and does not require reversal. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). In view of the nature of the crime and the strong evidence of Evans' guilt, there is no reasonable possibility that Evans would not have been convicted had the jury been kept ignorant of his membership in the gang. See id. Because the State did not argue that the murder was gang-related or motivated by Evans' membership in the gang, the references made by the State at trial were harmless.
Finally, Evans complains that the court erred in allowing evidence about his trip to Sanford on the night of the murder. This evidence was brought out at trial during the testimony of Evans' friend Gervalow Ward, who testified that Evans told the men that they were going to "rob some man that stayed in Sanford for five keys of dope." Edward Francis also testified about the plan to travel to Sanford "to rob some big dope dealer." This testimony was relevant, as it laid out Evans' motive for murdering Lewis. See Hunter v. State, 660 So.2d 244, 251 (Fla.1995). Evans was angry because Lewis left the men in Sanford, and there was testimony that Evans thought Lewis left the men in Sanford in order to steal Evans' money in Orlando. See, e.g., Foster v. State, 679 So.2d 747, 753 (Fla.1996) (evidence relevant to show defendant's motive and ultimately intent); State v. Shaw, 730 So.2d 312 (Fla. 4th DCA 1999) (evidence of prior attempted robbery admissible to show the motive and intent of the defendants); State v. Cohens, 701 So.2d 362, 364 (Fla. 2d DCA 1997) (evidence of prior attempted robbery admissible to show defendant's motive and intent).
Given the nature of this crime and the strong evidence of Evans' guilt, there is no reasonable possibility that Evans would not have been convicted if the jury had been kept ignorant of the shell casing found in the car, his membership in the gang, the reason why Evans and his colleagues traveled to Sanford, or any combination of these facts. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). After Evans returned from Sanford he waited for Lewis at the apartment. Once Lewis arrived, he was jumped, beaten, bound, and gagged. Evans made a homemade silencer for his gun, instructed Ward to check the backyard for any witnesses, and marched Lewis to the back of the apartment building to a culvert, where Lewis was pushed down. Evans also told Lewis they were the last three people he would leave behind and they were the last three people he would see on this earth. Evans then fired six shots into Lewis's head. There is no reasonable possibility that Evans would not have been convicted of *192 first-degree murder had the jury not been aware of any or all of the evidence Evans claims was erroneously admitted.

Penalty Phase Issues
Evans argues that the death penalty is not the appropriate sentence in this case because several of the aggravating factors should not have been found by the trial court and the trial court did not give the proper weight to the mitigating evidence.[4] More particularly, Evans argues that the cold, calculated, and premeditated (CCP) aggravator was improperly found. This Court has held that in order to establish CCP:
[T]he jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). Evans argues that because the trial court also found and *193 gave substantial weight to the mitigating factor that the capital felony was committed while Evans was under the influence of extreme mental or emotional disturbance at the time of the crime,[5] the trial court could not have logically found that Evans was able to create a "careful plan or prearranged design to kill" as required by Rogers v. State, 511 So.2d 526 (Fla. 1987). Additionally, he argues that this mental factor made it impossible for him to be able to formulate a "cold-blooded intent to kill that is more contemplative, more methodical, more controlled than that necessary to sustain a conviction for first-degree murder," as required by Nibert v. State, 508 So.2d 1, 4 (Fla.1987).
We disagree and affirm the trial court's determination that this murder was cold, calculated, and premeditated. The trial court in the sentencing order recognized that irrespective of Evans' mental illness at the time of the crime he was able to control his actions and plan his next steps. The trial judge said that Evans was
quite capable of recovering from the sudden break down in the plans to commit the home invasion robbery. He was capable of making his way to a nearby residence and securing transportation back to Orlando. He managed to get back to Orlando before Mr. Lewis so that he could await his victim's arrival. Defendant was in control enough to first interrogate Mr. Lewis and then have him bound and gagged. He was thinking clearly enough to avoid connection to the murder by removing Mr. Lewis from the apartment before shooting him. Mr. Lewis [sic] [Mr. Evans] was rational enough to place a silencer over the barrel to further avoid detection.
These statements are an accurate reflection of the sequence of events that took place on the night of the murder. The fact that the trial court recognized and gave substantial weight to the mental mitigator does not necessarily mean that the murder was an act prompted by emotional frenzy, panic, or a fit of rage, as Evans argues here. A defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation. See Sexton v. State, 775 So.2d 923, 934 (Fla.2000) (evidence established heightened premeditation, lengthy and careful planning and prearrangement, and an execution-style killing to support CCP aggravator despite "great weight" given to the defendant's mental impairment). While the events leading up to the murder may have made Evans emotionally charged, his actions do not suggest a frenzied, spur-of-the-moment attack. The evidence in this case supports the trial court's findings; therefore, the trial court did not err in finding CCP.
Evans next argues the heinous, atrocious, or cruel (HAC) aggravator is inapplicable for the same reason that he believes the CCP aggravator is inapplicable. He says his mental illness negates any intent to inflict pain and any showing that he was utterly indifferent to Lewis's suffering. He further argues this murder was committed in a heat of passion, and HAC is generally not applicable to heat of passion crimes.
*194 The evidence does not support Evans' heat of passion argument. The HAC aggravator focuses on "the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Brown v. State, 721 So.2d 274, 277 (Fla.1998). In Hall v. State, 614 So.2d 473 (Fla.1993), we defined the HAC aggravator as follows:
Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. Cruel means that designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others. The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.
Id. at 478 (quoting trial court's instruction). Additionally, in Alston v. State 723 So.2d 148, 161 (Fla.1998), this Court held:
Execution-style murders are not HAC unless the state presents evidence to show some physical or mental torture of the victim. Regarding mental torture, this Court, in Preston v. State, 607 So.2d 404 (Fla.1992), upheld the HAC aggravator where the defendant "forced the victim to drive to a remote location, made her walk at knifepoint through a dark field, forced her to disrobe, and then inflicted a wound certain to be fatal." Id. at 409. We concluded that the victim undoubtedly "suffered great fear and terror during the events leading up to her murder." Id. at 409-10.
Id. at 161 (citations omitted). Thus, a finding of HAC can be supported by the physical or mental torture suffered by the victim prior to death.
In this case, the trial court found that when Lewis entered the apartment after the botched robbery, he was immediately grabbed and beaten, bound and gagged, then forced to wait in a back room while police officers were at the door. After the officers left, Lewis was marched outside to a culvert where Evans chastised him for leaving them at the Sanford location, told him these would be the last persons he would ever see, and then shot him six times.
Evans argues that Lewis was not tortured because the shooting was quick. However, "[f]ear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous." Preston v. State, 607 So.2d 404, 410 (Fla. 1992). In this case, when considering the entire sequence of events beginning with Lewis taking the getaway car and culminating in his execution, it was reasonable for the trial court to conclude that Lewis suffered fear and emotional strain.
Evans suggests that the facts in Green v. State, 641 So.2d 391 (Fla.1994), are akin to this case. The execution-style shooting in this case, however, differs from what appears in Green to have been a murder which took place after the defendant was shot at by the victim and which did not involve mental torture. Evans characterizes the shooting in this case as one that took only a matter of minutes. However, the chain of events leading to Lewis's murder took hours. It is clear that Lewis was beaten as punishment for leaving the men stranded. It is also clear that he was bound and gagged and spent some time in a back room while the police inquired about a stolen vehicle. While in the back room, someone had a gun and was playing with the scope and laser, pointing it at Lewis. Whether Lewis saw Evans construct the homemade silencer is unclear from the record. But it is clear that Lewis was marched out back, still bound and gagged, and that Evans told him he was *195 looking at the last three people he would ever see. These facts render this case different from Green, where the facts show that the defendant in Green shot his victim one time immediately following the victim's attempt to shoot him. The trial court did not err in finding HAC applicable to these facts.
Evans also argues the trial court improperly balanced the aggravating factors against the mitigating factors. In essence, he argues his death sentence is improper because it is the result of "the inflamed emotions of jurors," the trial court's erroneous findings of the CCP, HAC, and the felony murder aggravators, and the trial court's improper weighing some of the aggravating and mitigating evidence. The cases from this Court make it clear that in weighing the aggravating and mitigating circumstances the trial court has wide discretion. The trial court's determination on these issues will be affirmed if based on competent substantial evidence. See Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990). The trial court's review of both the aggravating and mitigating circumstances is reflected in the sentencing order. Evans has failed to demonstrate that the trial court's determinations on these issues are not supported by competent substantial evidence.
After discussing the aggravating factors and the statutory mitigating factors, as well as the weight to be given to each factor, the trial judge said, prior to a lengthy discussion of the nonstatutory mitigating evidence, the following:
In his Memorandum in Support of a Life Sentence, Defendant through counsel, has suggested forty-two (42) nonstatutory mitigating factors. The Court has reviewed and considered each of the nonstatutory mitigating factors suggested. They fall loosely into seven categories. Those are: mental health issues; substance abuse issues; issues relating to codefendants and uncharged participants; family, community and character factors; physical injuries; disappointments in life; and miscellaneous factors. The Court has considered the testimony and evidence presented at trial, at the sentencing hearing and has reviewed and considered the documentation proffered at the Spencer hearing.
The trial judge then discussed under the seven headings outlined the evidence that had been presented during the penalty phase hearings.
As was discussed above, the trial court properly found as aggravating that this murder was not only cold, calculated and premeditated, but also heinous, atrocious, or cruel. While admitting that the he was convicted of kidnapping,[6] Evans argues the felony murder aggravator does not apply because the victim was only moved from inside the apartment to the backyard. This is sufficient movement under the kidnapping statute to sustain Evans' conviction; the asportation to the backyard made the murder easier to commit and lessened the risk of detection. See Faison v. State, 426 So.2d 963 (Fla. 1983); Kent v. State, 702 So.2d 265 (Fla. 5th DCA 1997); Rodriguez v. State, 681 So.2d 728 (Fla. 2d DCA 1996). Evans also concedes there is evidence to support the prior violent felony aggravator and the under sentence of imprisonment aggravator but argues they should be given slight weight. Again, Evans has failed to demonstrate error in the trial court's determination that these five aggravating *196 circumstances outweigh the mitigating circumstances found to exist.
As for the weight given to the mitigating factors, the trial court gave one of the mental health mitigators "substantial weight," but found that Evans' mental impairment did not impede his ability to appreciate the criminality of his actions. The trial court found that Evans was capable of planning the robbery, and that when Lewis left in the getaway car, it was Evans who led the group to Stafford's home. It was Evans who called his girlfriend to warn her and instruct her to call the police and report the getaway car as stolen. Evans managed to get back to his apartment before Lewis arrived, and instructed the other men what to do when Lewis got there. Evans directed one of the men to get something to tie up Lewis, "or else he'd be next." Evans demanded a shampoo bottle. Evans constructed the homemade silencer. Evans directed the men to go in a back room while the police were there. Evans had someone check out back for clearance. And finally, Evans pulled the trigger on the gun. Although the trial court agreed that there was substantial evidence that Evans suffers from some sort of mental impairment, that mental impairment did not affect Evans' ability to plan and direct this murder.
Next, Evans argues that under Florida law, the death penalty is disproportionate to the facts in this case. "This Court performs proportionality review to prevent the imposition of `unusual' punishments contrary to article I, section 17 of the Florida Constitution." Sexton v. State, 775 So.2d 923, 935 (Fla.2000). In deciding whether death is a proportional penalty, this Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See id. at 936 (citing Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998)). Comparing the circumstances in this case to circumstances in other cases where the death penalty has been imposed, we find that the sentence in this case is not disproportionate.
The trial court properly found five aggravating factors and a number of mitigating factors. Of the four statutory mitigating factors argued, the trial court gave substantial weight to the fact that Evans was under extreme mental or emotional disturbance, and gave some weight to the fact that Evans may have been unable to appreciate the criminality of his act or conform his conduct to the requirements of law. Of the forty-two nonstatutory mitigating factors, which were divided into seven categories, the trial court gave little weight to substance abuse issues and little weight to family, community, and character issues. The mental health issues were considered as a part of the trial court's findings on the statutory mental health mitigators. On the issues relating to the codefendants, the trial court explained the relative culpability of each of the codefendants and determined that Evans was the most culpable of all of the participants in this murder. The categories involving disappointments, physical injuries, and miscellaneous items were given no weight because the trial court found these items were not supported by the evidence or the incident was so remote in time as to not be mitigating under the facts of this case.
This Court has affirmed death sentences where there existed similar aggravating circumstances and the same type of mitigating circumstances. In Spencer v. State, 691 So.2d 1062 (Fla.1996), the trial court sentenced the defendant to death after finding two aggravating circumstances (prior conviction for a violent felony and HAC), two mental heath mitigators, and a number of nonstatutory mitigators (drug and alcohol abuse, paranoid personality disorder, sexual abuse by his father, honorable *197 military record, good employment record, and the ability to function in a structured environment). Additionally, in Foster v. State, 654 So.2d 112 (Fla.1995), we affirmed a sentence of death where the trial court found the three aggravating circumstances of HAC, CCP, and murder committed during the course of a robbery. The trial court also found fourteen nonstatutory mitigating circumstances, including mental or emotional disturbance that was not extreme and an inability of the defendant to conform his conduct to the requirements of law that was not substantially impaired. And in Lawrence v. State, 698 So.2d 1219 (Fla.1997), we found a death sentence proportional where there were three strong aggravators, (HAC, CCP, and under sentence of imprisonment), weighed against five nonstatutory mitigators (including a learning disability, low IQ, deprived childhood, influence of alcohol, and a lack of a violent history). See also Johnson v. State, 660 So.2d 637 (Fla.1995) (death sentence proportional where the trial court weighed and considered the aggravating circumstances of HAC, prior violent felony, and murder committed for financial gain and fifteen mitigating circumstances including mental illness not sufficient to be a statutory mitigator).
The sentence of death in this case is proportional.
As his final issue, Evans argues that the death sentence is grounded in a split jury vote of eleven to one, and is therefore unconstitutional since it was not a unanimous vote. This argument has previously and repeatedly been rejected by this Court. See Sexton v. State, 775 So.2d 923 (Fla.2000); Larzelere v. State, 676 So.2d 394, 407 n. 7 (Fla.1996); Hunter v. State, 660 So.2d 244, 252-53 & n. 12 (Fla. 1995) (citing James v. State, 453 So.2d 786, 792 (Fla.1984)).
Therefore, for the reasons set forth above, we affirm Evans' conviction for first-degree murder and his sentence of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] In total, the experts in this case personally evaluated Evans at least ten times. After each visit, Dr. Berns and Dr. Gutman submitted reports to the trial court while Dr. Herkov submitted his report to the defense. Also, the trial court received two detailed summaries from the Department of Children and Families regarding Evans' competency after hospitalization.
[3] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[4] The trial court found five aggravating factors: (1) the capital felony was committed by a person under sentence of imprisonment or placed on community control; (2) Evans was previously convicted of a felony involving the use or threat of violence; (3) the capital felony was committed while Evans was engaged in the commission of a kidnapping; (4) the capital felony was especially heinous, atrocious, or cruel; (5) the capital homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral justification.

The trial court gave substantial weight to one statutory mitigating factor: the capital felony was committed while Evans was under the influence of extreme mental or emotional disturbance. The trial court gave some weight to the statutory mitigating factor that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The trial court found that the evidence does establish that Evans suffers from some sort of mental or emotional disorder, but it does not establish that Evans was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
As for nonstatutory mitigating factors, Evans asserted forty-two factors. There were ten nonstatutory mitigators raised relating to mental health issues. These issues were considered and accorded proper weight as a mental health statutory mitigator. There were five nonstatutory mitigators related to substance abuse. The trial court gave these mitigating factors "little weight" because there was no evidence that on the night of the murder Evans had consumed any particular amount of alcohol or drugs or that his faculties were so impaired as to prevent him from conducting himself in accordance with the law. There were six mitigators offered with regard to codefendants and uncharged participants. The trial court gave "no weight" to these mitigating facts because it was Evans who planned the robbery, who was the moving force in securing and beating Lewis, and who obtained the gun, built the silencer, and fired six bullets into Lewis's head. There were fifteen mitigators offered with regard to family, community, and character issues. The court gave these factors "little weight" because most of the mitigating factors in this category occurred before Evans was convicted of robbery (which occurred some time prior to these crimes). There were two nonstatutory mitigators offered as to physical injuriesthe two head injuries. The court gave these factors "no weight." Two nonstatutory mitigators were offered with regard to disappointments in Evans' life. Evans was disassociated from his church and was rejected by the fire department. The court gave these "no weight" since they happened years prior to the shooting. There were two other nonstatutory mitigators that were also given "no weight." One involved a claim that Evans and Lewis had a previous altercation which was offered to show Evans was disturbed. The other was offered to show that Lewis may have been unconscious at the time of the shooting. The evidence did not support such an allegation.
[5] It is clear from the trial court's discussion of this mitigating factor that this finding was based on the fact that three mental health experts indicated that Evans suffers from a mental or emotional disorder. Although the experts did not agree as to the type of disorder, the trial court on two occasions prior to trial involuntarily hospitalized the defendant.
[6] Evans does not make an argument that there was insufficient evidence to support his conviction for kidnapping.