997 So.2d 1073 (2008)
Eddie Lee SEXTON, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-286.
Supreme Court of Florida.
September 18, 2008.
Rehearing Denied December 17, 2008.
*1075 Bill Jennings, Capital Collateral Regional Counsel, Robert T. Strain and David Robert Gemmer, Assistant CCR Counsel, Middle Region, Tampa, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
Eddie Lee Sexton appeals an order denying his amended motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. This Court has jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the trial court's denial of postconviction relief.

FACTS AND PROCEDURAL HISTORY
Sexton, who was fifty-two at the time of the murder, was convicted of the 1993 first-degree murder of Joel Good, his son-in-law, and was sentenced to death. His initial conviction was reversed on direct appeal because of admission of unduly prejudicial evidence of Sexton's collateral bad acts. Sexton v. State, 697 So.2d 833, 837-38 (Fla.1997). The case proceeded to a new trial and new sentencing proceeding, *1076 which resulted in a conviction for first-degree murder and a death sentence. Both his conviction and death sentence were affirmed on direct appeal. See Sexton v. State, 775 So.2d 923, 929, 937 (Fla. 2000).[1] The pertinent facts of the case regarding the murder are set forth in this Court's decision affirming Sexton's direct appeal following his retrial:
Sexton was initially tried and convicted of first-degree murder and sentenced to death in 1994 for the killing of Joel Good, the husband of Sexton's daughter, Estella Mae Good ("Pixie"). Joel was murdered by Sexton's mentally challenged twenty-two-year-old son, Willie Sexton, who strangled him to death under Sexton's direction. On appeal, this Court reversed the judgment and sentence and ordered a new trial....
... The State's theory of prosecution was that Sexton so totally dominated, controlled and directed every facet of Willie's life that Willie killed Joel at Sexton's direction. On retrial, the State introduced the following evidence.
Sexton fled to Florida in 1993 with his family and the victim to avoid arrest and prevent the Ohio Department of Human Services ("DHS") from removing his children from the home. Sexton was the father of thirteen children, not counting the three children he allegedly fathered with his two daughters. After leaving Ohio, Sexton and his family moved to Oklahoma, Indiana, and eventually to Hillsborough River State Park in Florida....
While residing in Hillsborough River State Park, Sexton's infant grandchild, Skipper Lee Good, the son of Pixie and Joel, died under suspicious circumstances.... One night, the baby would not stop crying. Sexton ordered Pixie to quiet the baby or else he would do it for her. Pixie put her hand over the baby's mouth until the child stopped crying. The next morning the baby was dead. Sexton instructed Willie and Joel to bury the baby in the woods inside the Hillsborough River State Park....
According to Pixie, Joel was very upset over the loss of his child and wanted to bring the child back to Ohio for a proper burial. Shortly before the death of his infant son, Joel had learned Sexton was the father of Pixie's two daughters. After Joel confronted Sexton with this information, Sexton and Joel got into a fight. Because Joel knew about the baby's death and the fact that Sexton fathered two children with his daughter, Pixie, Sexton would not allow Joel and Pixie to return to Ohio. Sexton feared Joel would provide authorities with information pertaining to the Sexton family's current whereabouts, the death of the baby, and ongoing child abuse.
. . . .
At some point, the Sextons moved to Little Manatee State Park, the place where Joel was killed. Willie testified to the following course of events surrounding the murder. As Joel continued to express his interest in returning to Ohio, Sexton began telling his son, "Willie, I got a job for you to do," and that he wanted Willie to "put Joel to sleep." On the day of Joel's murder, Sexton told his wife that "today is the day that Willie is going" to kill Joel. Thereafter, Sexton, his wife, and a few of the younger Sexton *1077 children left the campsite for a picnic.... Both Pixie and Willie testified that Sexton returned from the picnic and joined Willie and Joel in the woods. According to Willie, Sexton told him to take the garrote out of his pocket and place it around Joel's neck. After placing the garrote around Joel's neck, Sexton told Willie to turn it "fast and hard." Willie told Joel that he was "just trying to put you to sleep." ...
. . . .
Another one of Sexton's children, Charles Sexton, who did not testify at the first trial, also testified that ... he witnessed the murder and that Sexton actually committed the final act that led to Joel's death....
. . . .
The State presented evidence that Willie had killed Joel because he was ordered to do so by Sexton and because he was afraid of his father....
... According to Willie, Sexton began having anal intercourse with him at age nine. This activity continued during the Sextons' stay in Florida. Sexton physically beat Willie with his fists, a belt, a baseball bat, and an electric belt....
In contrast to the first trial, at the conclusion of the State's case, Sexton presented no defense during the guilt phase of the trial. The jury convicted Sexton.[[2]]
Id. at 925-29 (footnotes omitted).
In sentencing Sexton to death after a jury recommendation of eight-to-four, the trial court found three aggravating circumstances: (1) that Sexton was previously convicted of a prior violent felony (robbery); (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (3) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification ("CCP"). Id. at 929.
As to mitigation, counsel presented two psychologists to testify about Sexton's brain dysfunction, which was discovered after a PET (Positron Emission Tomography) scan was administered. Id. at 936-37. Based primarily on the evidence of Sexton's brain damage in the second penalty phase, the trial court found one statutory mitigator, namely, that Sexton was under extreme mental or emotional disturbance at the time the murder was committed, and gave this mitigator great weight. Id. at 929.
Further, the jury heard substantial evidence of Sexton's childhood and background, including that Sexton's father died when he was only ten, that his mother was disabled by a stroke during his childhood, that Sexton had a low IQ, and that he later developed multiple sclerosis and other serious medical problems. Based on this testimony, the trial court found several nonstatutory mitigators, which were assigned some weight.[3] After considering the aggravators and the mitigators and concluding that the aggravators outweighed the mitigators, the trial court imposed a death sentence. See id.
*1078 Sexton filed his initial and amended postconviction motions under Florida Rule of Criminal Procedure 3.851 raising nine claims.[4] The trial court held an evidentiary hearing on the claim that counsel was ineffective in investigating and presenting mitigation in the penalty phase of the trial. The postconviction court denied relief after the evidentiary hearing, finding that penalty phase counsel performed a reasonable investigation into Sexton's childhood and background to discover potential mitigation. The trial court concluded:
Counsel's investigation is not deemed deficient simply because family members are now12 years after the murder and 8-10 years after the penalty phasesproviding potential mitigation information. Additionally, the Court finds counsel was aware of other potential mitigation, such as Defendant's military service, mental health issues and physical conditions such as multiple sclerosis, but made the strategic decision to focus on Defendant's brain damage instead; that was an informed decision based on a reasonable investigation of the available mitigating evidence.
The court summarily denied the remainder of Sexton's claims that related to the guilt phase and to constitutional claims. Sexton now appeals the order denying postconviction relief, raising six issues for review.[5]

ANALYSIS

I. Ineffective Assistance of Penalty Phase Counsel
In his first issue on appeal, Sexton argues that the trial court erred in denying his claim that counsel was ineffective in the penalty phase for failing to adequately investigate and present mitigation evidence regarding Sexton's childhood and background, including his deprived upbringing, physical abuse by a sibling, lack of parental supervision, multiple sclerosis, and other medical problems. Sexton also *1079 alleges that his counsel failed to provide this additional mitigation to the mental health experts and was ineffective in the presentation of the mental health mitigation through two psychologists, primarily focusing on the results of a PET scan that disclosed brain dysfunction.
In order to prevail on his claim of ineffective assistance of counsel in investigating and presenting background mitigation, Sexton must satisfy the deficiency and prejudice prongs as set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable." Ferrell v. State, 918 So.2d 163, 170 (Fla.2005) (citing Wiggins, 539 U.S. at 523, 123 S.Ct. 2527, and Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
This Court has recognized that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). Clearly, "[a]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001) (quoting State v. Riechmann, 777 So.2d 342, 350 (Fla.2000)).
This is not a case where trial counsel failed to investigate, obtain or provide any background or childhood mitigation and could not therefore make a reasoned strategic decision about its presentation. Cf. Riechmann, 777 So.2d at 350 (finding counsel deficient where they conducted "no investigation and presented no evidence of mitigation"); Rose v. State, 675 So.2d 567, 572 (Fla.1996) (finding representation deficient where "counsel never attempted to meaningfully investigate mitigation"). Nor is this a case where counsel did not take reasonable steps to investigate Sexton's background for mitigation. Cf. Ragsdale, 798 So.2d at 719 (holding that counsel was ineffective due to inadequate investigation and failure to present certain mitigators where "counsel's entire investigation consisted of a few calls made by his wife to Ragsdale's family members").
Sexton instead primarily criticizes his trial counsel for a so-called "rifle" approach, which highlighted strong mental mitigation, rather than a "shotgun" approach that would include any and all factors discovered by counsel that might conceivably be considered mitigating. Further, Sexton claims that counsel was deficient for failing to understand the law of mitigation, as set forth in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),[6] and its progeny.
*1080 Initially, it should be noted that Sexton was represented by the same two attorneys at both the first and second trials. Therefore, trial counsel was cognizant of the mitigation that was presented in the first trial, which resulted in a jury recommendation of death by a seven-to-five vote where no mental mitigation was presented.[7] In contrast, at the second sentencing proceeding, penalty phase counsel presented two mental health experts to establish that Sexton suffered from brain damage, in addition to presentation of other nonstatutory mitigation similar to that presented in the first trial. As we will now discuss, we agree with the trial court that Sexton has failed to demonstrate that counsel was deficient in his mitigation investigation or presentation.

A. Childhood and Background Mitigation
In his first sub-claim, Sexton argues that counsel should have presented more detail about his impoverished and abused early life to support mitigation. To establish this claim, Sexton presented the testimony of Janet Vogelsang, a forensic social worker, who testified at the evidentiary hearing that the circumstances of Sexton's childhood would have caused him to grow up without any understanding of normal and appropriate behavior. In her interviews with Sexton's family members in 2004, she was told of his family's poverty, the lack of adult guidance due to his father's early death and his mother's long-term disability through his critical years of development, and the serious physical abuse he suffered at the hands of his older brother, Otis. Sexton's brother, David, was her main source of information about the family's poverty and the alleged physical abuse of Sexton by Otis. David Sexton's 2005 deposition testimony was also presented at the evidentiary hearing, in which he reported that Otis consistently abused and beat up Sexton when they were children.
David's report of Otis's abusive behavior toward Sexton was contradicted by Sexton's sister, Nellie Hanft, who testified at the first and second penalty phases, and by Sexton himself. Nellie told Vogelsang only that Otis hit Sexton in the stomach once. Sexton told Vogelsang that Otis's treatment of him was "rough" but did not mention a consistent pattern of abuse by Otis. Otis's deposition was also admitted into evidence, in which he denied all allegations of abuse. In David's first deposition taken before trial, he made no reports of poverty and physical abuse of Sexton as he was growing up. Vogelsang conceded that the reports of abuse were the first the family had given along these lines and that they did not report these same problems to Sexton's trial counsel at the time of trial. Further, from the evidence received at the evidentiary hearing and his own admission, David harbored ill feelings against Otis, who had reported to authorities that both David and Sexton had sexually *1081 abused their daughters. Vogelsang testified that she was not aware of this rancor between her main source, David, and his brother Otis.
David's credibility was assessed by the trial court, which stated that it "doubt[ed] the credibility of [David's] April 20, 2005 deposition testimony, especially in light of his prior testimony during the August 9, 1994 deposition." Also, in contradiction to Vogelsang's testimony, penalty phase counsel, Robert Fraser, testified that in his interviews with David Sexton and Nellie Hanft before trial, he was told that their childhood with Sexton had been normal. For instance, Nellie told him that their family was one of simple country folk who were religious and, while not affluent, were not poverty-stricken. Fraser said, "I don't remember any deprivation at all from his childhood." His notes from family interviews also disclosed that Sexton played baseball and football, ran track, and also worked at a bowling alley.
Fraser also explained the difficulty he had in obtaining mitigation information from family members by stating:
His family was kind of a study in shifting alliance. One day his brother might love him; the next day or the next month or the next year he would probably hate him. And then, of course, so many peopleso many members of his family, particularly his children testified repeatedly that they suffered at his hands sexual batteries. He doesn't seem to have many friends or he didn't seem to have many friends. He was justit was just very difficult.
... Nothing is volunteered. This goes back to what I was telling Mr. Strain how in some families they just close the door and they don't let you into the closet. They don't let you see the skeletons.
This is probably the worst case of this type I had ever seen. It was the most impenetrable.
Although Fraser was able to interview Sexton's wife, Estella, at the Ohio Reformatory for Women and she told him Sexton said he had been beaten as a child, Fraser explained that Sexton never told him of any such beatings. The other information Estella reported was clearly not of a mitigating nature, including that Sexton had raped and impregnated her younger sister, routinely beat her and their children, was abusive and controlling, and lied about going to Vietnam.
Even assuming that some testimony about physical abuse or childhood trauma suffered by Sexton could have been presented, Fraser explained, "The fact that Eddie was older seemed to strain the connection between childhood trauma, problems and so forth and his behavior 40 odd years later." The trial court found that Sexton failed to demonstrate that counsel was deficient on this issue. In fact, the postconviction court specifically "[found] the testimony of Fraser to be highly credible and the evidence to be persuasive" and concluded that Fraser performed a reasonable investigation into Sexton's childhood and background to discover any possible mitigation and provided that information to the experts. We agree.
As to Sexton's early background, Fraser made numerous requests for medical and school records. He interviewed and deposed family members, traveling to Ohio in some instances to do so. Counsel employed an experienced investigator to assist in discovering available mitigation. Sexton, his brother David, and his sister Nellie gave no reports to Fraser of childhood difficulties, extreme poverty, or abuse. Any deficiency in obtaining background and childhood mitigation was caused by the reticence of Sexton and his *1082 family members at the time of trial and by the unavailability of records from some forty years earlier.
Based on our complete review of the record, we find that competent, substantial evidence supports the trial court's finding that counsel made a reasonable investigation into Sexton's background and childhood for mitigating circumstances; and that counsel presented the information he was able to obtain, given the reticence of family members and his own client to report any unfavorable family history and the inability to obtain certain records that were no longer available.[8] Counsel's investigation can be considered reasonable where counsel interviews all witnesses brought to his attention, but learns little that is helpful and much that is harmful. See Wiggins, 539 U.S. at 525, 123 S.Ct. 2527 (citing Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).
Further, the jury actually heard substantial evidence of Sexton's childhood and background, including that Sexton's father died when he was only ten, that his mother was disabled by a stroke during his childhood, that Sexton had a low IQ, and that he later developed multiple sclerosis and other serious medical problems. "The fact that a more thorough and detailed presentation could have been made does not establish counsel's performance as deficient" where nonstatutory childhood mitigation evidence was introduced. Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986).
Similarly, counsel was not shown to be ineffective in his decision to forgo presentation of evidence of Sexton's army service or his undesirable discharge. As counsel concluded, although he was aware of Sexton's army service, he did not think that information would have been helpful or mitigating. Sexton has simply not "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Therefore, the trial court was correct in finding that Sexton failed to show counsel was ineffective in regard to obtaining or presenting this childhood and background mitigation. Accordingly, we affirm the trial court's denial of Sexton's claim that counsel was ineffective in investigating and presenting mitigating evidence from his childhood and background.

Mental Health Mitigation
Sexton also claims that penalty phase counsel was ineffective in his presentation of mental mitigation. In deposition testimony admitted at the evidentiary hearing, Dr. David McCraney, a neurologist, testified that having the mitigation case revolve around the PET scan "was a big mistake" because it did not emphasize the deleterious effect of the brain dysfunction on Sexton's ability to control his behavior and to form intent. In Dr. McCraney's opinion, more emphasis should have been placed on Sexton's inability to resist impulses and his memory deficits, which *1083 would have impaired intent formulation. Importantly, however, Dr. McCraney conceded that this was a deficiency of the experts and not trial counsel, and that, although the expert evaluation should have been done in more detail focusing on intent formulation, the expert "lucked out" and chose the right tests to disclose the brain abnormality. He stated:
I'm going to frame this as a deficiency of the experts rather than trial counsel. I know that's the way it shakes out.
I mean, he's operating based on the advice that was given to him, but I feel that the neuropsychological evaluation should have been done in considerably more detail focusing on intent formulation.
I mean, there was really only one test of intent formulation that was administered. And fortunately, I guess, the doctor chose the right test because it came out abnormal so he wound up stumbling onto the correct conclusion. But that was, you know, probably about 50 percent luck and 50 percent being smart about it choosing the test that he did administer.
The postconviction court denied relief on this aspect of Sexton's claim, finding that the testimony of Drs. Irving Weiner and Frank Wood, which was presented during the penalty phase of the retrial, was similar to that proposed by Dr. McCraney. The court noted that "Dr. Weiner did reach the same conclusion [as Dr. McCraney] and informed the jury and the Court that the results of his evaluation suggested Defendant's behavior was consistent with brain dysfunction, and Defendant had limited tolerance for stress and diminished self-control, and Dr. Wood corroborated that information with the PET scan." This characterization of the penalty phase testimony also appears in the sentencing order of the trial court, which stated:
Two psychologists, Dr. Weiner and Dr. Wood, examined the defendant. Dr. Weiner's testing of the defendant revealed an I.Q. in the low 80s and showed large differences between his abilities in different measures. His scores on some tests ranged from 16 percentile to 2 percentile suggesting some kind of brain dysfunction. Dr. Weiner recommended a Positron Emission Tomography (PET) scan and that was administered by Dr. Wood. According to Dr. Wood it revealed a dysfunctional limbic system in the lower half of the brain.[[9]] An MRI examination conducted on the defendant following an automobile accident in 1991 showed structural injury on the top half of his brain as well. Dr. Wood opined that, as a result, the defendant does not respond normally to emotional situations and has memory deficits confining his functions to the present moment without a continuity of information from the past that normal people have. Dr. Weiner opined that the defendant had a "rather limited tolerance for stress" tending to diminish his self control below the normal level of expectation.
Penalty phase counsel explained his theory of the defense was that Sexton had clearly demonstrable brain damage, as was documented by the PET scan. The mental mitigation was channeled in this fashion *1084 because in his experience actual brain damage was usually a very persuasive mitigator. Also significant to counsel's decision was the fact that, prior to the first trial, Sexton was examined by Dr. Michael Maher, a forensic psychiatrist, who concluded that Sexton was a "sadistic sexual psychopath."[10] Fraser explained that Dr. Maher said that Sexton's history of bizarre sexual and criminal behavior might in some way indicate a mental illness, but the details of that behavior would be so inflammatory to a jury that it would counteract any possible mitigation. Dr. Maher further informed Fraser by letter that he had "examined Mr. Sexton thoroughly with regard to possible mental health defenses and found none that would be even remotely possible." Fraser explained that Dr. Maher's description of Sexton as a sadistic sexual psychopath, if heard by the jury, would be "tantamount to stipulating to death."
Clearly, if counsel had put on additional mental health evidence, it would have opened the door to further evidence that could have been damaging. Dr. Barbara Stein, a board-certified psychiatrist retained by the State before the second trial, testified at the evidentiary hearing that Sexton had an "antisocial personality disorder with ... histrionic personality traits."[11] She said this was reflected in his undesirable army discharge, his robbery conviction, having sex with his children, the fact that he raped his sister-in-law, his being something of a con man, his poor educational and occupational adjustment, and his substance abuse. She also concluded that he had "paraphilia not otherwise specified," which is a sexually deviant disorder that can include pedophilia or hebephilia.[12]
According to Dr. Stein, Sexton's paraphilia did not impair his ability to appreciate the criminality of his conduct or his ability to conform it to the requirements of the law at the time of the murder. Dr. Stein testified that neither the brain deficits identified in Sexton nor his multiple sclerosis would have caused the violent behavior he exhibited at the time of the crime, impaired his capacity to appreciate the criminality of his conduct or to conform it to the law, affected his ability to be goal-directed, organized and able to plan, or prevented him from knowing right from wrong. This was shown, she said, by the detailed and extensive questions Sexton had prepared for counsel to ask at trial and the videotape Sexton made for government officials, in which he complained of the treatment his family received from social workers in Ohio.
Because Dr. McCraney attributed the alleged deficiencies in presentation of mental mitigation to the experts and not to *1085 counsel, and because the expert testimony given by Drs. Weiner and Wood was substantially similar to the testimony that Dr. McCraney believed was essential, Sexton has failed to establish that trial counsel was ineffective in obtaining and presenting mental mitigation. The fact that Dr. McCraney, some seven years later, disagreed with the extent or type of testing performed, or the type of mitigation presented, does not mean that trial counsel was deficient at trial. See Stephens v. State, 975 So.2d 405, 415 (Fla.2007) ("Being able to secure an expert witness to provide an opinion as to mental health mitigation during postconviction proceedings, which arguably could have been helpful to [the defendant], does not, in and of itself, render trial counsel's performance ineffective." (agreeing with trial court's finding)); Peede v. State, 955 So.2d 480, 494 (Fla.2007) ("The fact that Peede produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective.")
Moreover, in view of the initial unfavorable report by Dr. Maher, Fraser reasonably decided to focus on actual brain damage as the main mitigator and was not deficient in this respect. See Dufour v. State, 905 So.2d 42, 57 (Fla.2005) (finding that counsel was not deficient by failing to retain a new expert after receiving an unfavorable report from an examining mental health expert). Penalty phase counsel's limitation of mental mitigation to brain dysfunction was also reasonable considering that going beyond that would have opened the door to the testimony of the State's expert that, at the time of the crime, Sexton had antisocial personality disorder and paraphilia, and in light of Dr. Maher's original characterization of Sexton as a sadistic sexual psychopath. See Willacy v. State, 967 So.2d 131, 143-44 (Fla. 2007) (concluding that counsel's strategy to forgo presentation of some mental mitigation was reasonable where it "would have opened the door to aggravating facts," including the defendant's prior bad acts, threats of violence, and cruelty to animals).
In summary, competent, substantial evidence presented at the postconviction hearing established, and the postconviction court found, that penalty phase counsel made an informed strategic decision to focus on actual brain damage as statutory mental mitigation and was successful in convincing the trial court to find and assign great weight to the statutory mitigator of extreme mental or emotional disturbance based on the experts' testimony. Sexton has failed to demonstrate that penalty phase counsel was deficient in any respect in investigating or presenting Sexton's childhood and background mitigation or mental mitigation. Therefore, the trial court's order denying relief on this claim is affirmed.

II. Summarily Denied Claims of Ineffective Assistance in the Guilt Phase
Sexton next argues that the trial court erred in summarily denying eleven guilt phase claims of ineffective assistance, which assert that counsel failed to object to prosecutorial comment, to hearsay testimony, to certain other evidence, and during voir dire.[13] Further, despite raising *1086 eleven claims that he contends were improperly denied without an evidentiary hearing, Sexton has chosen not to present this Court with specific arguments explaining how, in each instance, counsel was ineffective or what prejudice flows from the deficiency. Because Sexton does not provide in the initial brief "an explanation why summary denial was inappropriate or what factual determination was required on each claim so as to necessitate an evidentiary hearing," his conclusory argument is insufficient to preserve his claim. See Doorbal v. State, 983 So.2d 464, 482-83 (Fla.2008) (citing Randolph v. State, 853 So.2d 1051, 1063 n. 12 (Fla.2003)).
"[W]hen reviewing a court's summary denial of an initial rule 3.851 motion, an appellate court must accept the movant's factual allegations as true, and the appellate court will affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim or the existing record demonstrates that there is no issue of material fact to be determined." Rose v. State, 985 So.2d 500, 505 (Fla.2008). We have made clear through rule 3.851 that evidentiary hearings should be the norm when there are factual issues to be developed. But in this case, Sexton offers no new witnesses to cast doubt on his guilt or new evidence that he claims counsel should have presented. Essentially, he asserts that counsel was deficient in not objecting to certain comments during voir dire and in allowing certain testimony to come before the jury. While those types of alleged deficiencies can be a basis for an ineffective assistance of counsel claim, merely asserting deficiency without more specific factual allegations is insufficient to mandate an evidentiary hearing. The trial court fully discussed each claim, attached the relevant portions of the record, and explained why, based on the facts in the record and the applicable law, the requirements of Strickland were not met. We have grouped similar claims together and will discuss them briefly below.[14]

A. Failure to Object During Voir Dire
Sexton first contends that there were certain comments made by the prosecutor during voir dire that were improper and should have been objected to by counsel. We have reviewed his claims and conclude there was no impropriety in the comments and hence no deficiency. As to Sexton's claim that counsel was ineffective for not objecting to venire members walking in and out during voir dire, this claim was properly denied because the record confirms that counsel objected. Further, any complaint regarding the trial courts response to this objection should have been raised on direct appeal and is *1087 therefore procedurally barred. See Pooler v. State, 980 So.2d 460, 470 (Fla.2008) (citing Spencer v. State, 842 So.2d 52, 60-61 (Fla.2003)).
There is also no merit to Sextons claim of alleged deficiency for failure to seek individual voir dire of four venire members who indicated they had heard or read details of the case because three of the jurors did not serve. As to the fourth, juror Hart, this claim is properly denied because Sexton failed to make any claim of actual bias, Carratelli v. State, 961 So.2d 312, 324 (Fla.2007), and no evidence of bias appears in the record. As the trial court found, juror Hart stated that he had no opinions about the case based on what he had heard or read. Thus, the trial court correctly denied these claims without an evidentiary hearing.

B. Failure to Object to Comments During Opening and Closing Statements
First, Sexton alleges that counsel was ineffective for failing to object to prosecutorial comments in both opening and closing arguments. However, we have reviewed each of the alleged improper prosecutorial comments and agree with the trial court that none of the comments was improper under the facts of this case. Thus, this claim is without merit and was properly denied.
Second, Sexton argues that his counsel was ineffective for explaining in his opening statement that Sexton engaged in sexual abuse and unusual familial relationships. Defense counsel stated to the jury:
You're going to learn very quickly in this trial, if you haven't already, that Eddie Sexton is a far cry from the all American father. You're going to hear evidence that he engaged in conduct before he was arrested in this case with his children that could be considered reprehensible. You're going to learn that he took liberties with his children that may ask youor may cause you to ask yourselves and wonder, can this kind of thing really happen; does this really go on. I'm here to tell you that the evidence will show that in the Sexton family this did go on.
This is a case about a very sick family. There will be a lot of mud thrown at the man sitting behind mesome of it true, some of it speculative, all of it ugly, all of it nasty, but none of it first-degree murder, and that is what you're here to decide. Eddie Sexton is not a murderer, and the only issue for you to pass upon is whether the evidence establishes that he's guilty of first-degree murder or if he's not guilty.
We conclude that there is no deficiency in this regard. This evidence was to be admitted regardless of whether it was discussed in opening statements and counsel was simply referring to uncontradicted facts about Sexton's relationship with his family. Sexton has failed to demonstrate any deficiency in these comments of trial counsel.

C. Failure to Object to Certain Testimony and Evidence
Sexton next argues that counsel was ineffective for not objecting to certain testimony and the introduction of evidence. Initially, Sexton argues that counsel was ineffective for not objecting to the lack of foundation for the testimony of Judy Genetin, an Ohio social worker, in which she stated that paternity tests established that Sexton fathered two children with his own daughter, Pixie. On direct appeal from the first trial, this Court held:
With respect to the evidence that Sexton had fathered two of Pixie's children, *1088 was involved in the death of Pixie and Joel's baby, and had engaged in a standoff with Ohio police that resulted in him becoming a fugitive, we find that the trial court did not abuse its discretion in ruling this evidence relevant.
Sexton, 697 So.2d at 837. Even if counsel should have objected to the lack of foundation for Genetin's knowledge, see Dep't of Health & Rehab. Servs. v. Moore, 603 So.2d 13, 14 (Fla. 5th DCA 1992) (holding that paternity tests are not admissible where unauthenticated and a predicate has not been laid), Pixie also testified that Sexton was the father of two of her children. Therefore, we conclude that no prejudice can be established.
Next, Sexton contends that counsel was ineffective for failing to object to a videotape of Sexton made by Sexton for presentation to "the authorities," in which he discussed his personal and family problems resulting from the State of Ohio's removal of his children from his custody for a period of time and which was ultimately the impetus for Sexton's flight to Florida. Although counsel stipulated to its admission if portions of the video showing Sexton's children were excised, which they were, Sexton failed to identify those specific portions of the tape that were objectionable or prejudicial. As the Court warned in Doorbal, nonspecific allegations are insufficient to obtain an evidentiary hearing on claims of ineffective assistance of counsel, and counsel should not assume that specific arguments need not be presented until the evidentiary hearing. 983 So.2d at 482. The problem is compounded when no specific arguments are presented in the appellate brief identifying the inadmissible portions of the evidence that counsel should have objected to at trial.
Sexton has not identified any specific legal basis on which his attorney should have objected to any or all of the videotape. In fact, portions of the video could be interpreted as showing him in a sympathetic light as a loving, if not severely troubled, fatherall tending to humanize him for the jury. In addition, Sexton chose not to testify at trial, so the video allowed him to speak to the jury without cross-examination. Finally, the video contained information found to be relevant in the case, including why Sexton fled to Florida and had a motive to keep Joel from returning to Ohio.[15] Because portions of the video were clearly relevant and may even have had a positive effect, Sexton has not demonstrated that his counsel was deficient in failing to object on the ground of relevance. Therefore, relief is not warranted on this claim.

D. Failure to Object to Speculation and Hearsay
Sexton claims that counsel was ineffective for failing to object to numerous instances of hearsay testimony. We have reviewed each of these assertions and conclude that Sexton has not alleged a basis on which to have an evidentiary hearing because he has not demonstrated error in the trial court's admission of the testimony. Accordingly, we affirm the trial court's summary denial of these claims.

E. Cumulative Error
Sexton contends that the trial court erred in failing to conduct a proper cumulative analysis. Because no errors were identified, no cumulative analysis is necessary. See, e.g., Rogers v. State, 957 So.2d *1089 538, 554 (Fla.2007) (stating that because each claim is procedurally barred or without merit, the cumulative error claim must fail).

III. Constitutional Challenges

A. Rules Limiting Juror Interviews
Sexton alleges that Rule Regulating the Florida Bar 4-3.5(d)(4) and Florida Rule of Criminal Procedure 3.575 are unconstitutional to the extent that they prohibit his counsel from interviewing jurors on a wider range of subjects than grounds for legal challenge to the verdicts. This identical claim has been repeatedly rejected as both procedurally barred when brought on postconviction and on the merits. See, e.g., Barnhill v. State, 971 So.2d 106, 116-17 (Fla.2007).

B. Constitutionality of Lethal injection
Sexton contends that lethal injection as it is performed pursuant to Florida's current three-drug protocol constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and the Florida Constitution. We have previously denied this same challenge to the current lethal injection protocol and therefore deny relief on this claim. See Lightbourne v. McCollum, 969 So.2d 326, 329-30 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008); Schwab v. State, 969 So.2d 318, 325 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2486, 171 L.Ed.2d 777 (2008). This same method of execution, consisting of lethal injection of the same three-drug combination under similar protocols, has also been found by the United States Supreme Court to be constitutional. See Baze v. Rees, ___ U.S. ___, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Most recently, we rejected a successive attack on lethal injection after Baze in Schwab v. State, 995 So.2d 922 (Fla. 2008). Lastly, in Diaz v. State, 945 So.2d 1136, 1143 (Fla. 2006), cert. denied, ___ U.S. ___, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006), we rejected the contention that Florida's lethal injection statute violates the separation of powers doctrine set forth in article II, section 3, of the Florida Constitution. Therefore, we affirm the trial court's summary denial of this claim.

C. Incompetency to be Executed
Sexton's claim that he is not competent to be executed, which he raised in this case for preservation purposes, is not ripe because he is not under a death warrant. See, e.g., Barnhill, 971 So.2d at 118.

CONCLUSION
For all of the reasons set forth above, we affirm the trial court's denial of Sexton's motion for postconviction relief.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, and BELL, JJ., concur.
CANTERO, Senior Justice, did not participate.
NOTES
[1] Sexton raised five issues on direct appeal: (1) the admission of testimony relating to the death of infant Skipper Lee Good; (2) Sexton's request for new counsel; (3) admission of victim impact testimony; (4) sufficiency of the evidence; and (5) several penalty phase issues including weighing of the sentencing factors, proportionality, and the claim that Florida's capital sentencing scheme is unconstitutional. Id. at 929-37.
[2] Another distinguishing factor of the retrial is that Willie Sexton testified against his father, which he did not do at the original trial.
[3] The trial court gave some weight to the following nonstatutory mitigators: "(1) Sexton was capable of kindness to children and would even act as Santa Claus at Christmas; (2) Sexton was the pastor of a church attended by family and friends; (3) Sexton often helped his mother and sisters with household chores and repairs; (4) Sexton's father died when the defendant was ten years old, depriving him of a male role model; and (5) the codefendant, Willie, received a lesser sentence of twenty-five years' imprisonment." Id.
[4] Sexton raised the following claims in his postconviction motion: (1) ineffective assistance during the guilt phase by failing to conduct an adequate voir dire and failing to object to evidence during the State's case; (2) ineffective assistance during the penalty phase by failing to adequately investigate mitigation, provide mental health experts with mitigating evidence, and adequately challenge the State's case; (3) death sentence is unconstitutional because the penalty phase jury instructions were erroneous and shifted the burden to the defense to prove that death was inappropriate, and counsel was ineffective for failing to object on this basis; (4) Florida's statute is unconstitutional because it fails to prevent the arbitrary and capricious application of the death penalty and counsel was ineffective for failing to raise this issue; (5) denial of effective assistance of postconviction counsel because of the rules prohibiting juror interviews; (6) execution by lethal injection constitutes cruel and unusual punishment; (7) the death penalty statute is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (8) cumulative error; and (9) Sexton's Eighth Amendment rights may be violated because he may be incompetent at the time of his execution.
[5] The issues on appeal are: (1) whether the trial court erred in denying the claim that counsel was ineffective during the penalty phase for failing to adequately investigate mitigation, provide mitigation evidence to the mental health experts, and challenge the State's case; (2) whether the trial court erred in summarily denying the guilt phase claims; (3) whether the trial court erred in denying the cumulative error claim; (4) whether the trial court erred in denying the claim that Sexton has been denied effective assistance of postconviction counsel because of the rules prohibiting juror interviews; (5) whether the trial court erred in denying the claim that lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; and (6) whether the trial court erred in denying the claim that Sexton's rights prohibiting cruel and unusual punishment will be violated because he may be incompetent at the time of execution.
[6] Lockett held that the sentencing judge or jury may not be precluded from considering any evidence regarding mitigating circumstances that is proffered by a defendant. 438 U.S. at 604, 98 S.Ct. 2954; see also Coday v. State, 946 So.2d 988, 1013 (Fla.2006) ("The United States Supreme Court in a case from Florida held that a sentencer could not refuse to consider or be precluded from considering any relevant mitigating evidence." (citing Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987))), cert. denied, ___ U.S. ____, 127 S.Ct. 2918, 168 L.Ed.2d 249 (2007).
[7] In the first penalty phase, the trial court made the following findings on mitigation: (1) that Sexton was under emotional strain due to the efforts of Ohio officials to take custody of his children; (2) that he acted in a peculiar fashion at times; (3) that he demonstrated some human qualities; (4) that he played Santa Claus on at least one occasion and appeared to some as normal; and (5) that letters from family members described Sexton as kind, respectful, and helpful. The trial court found that the evidence did not support the claim that Sexton was disabled and dependent on pain medication.
[8] As found by the trial court, the evidence established that Fraser provided the background information and medical and health records that he did obtain to the experts who testified at the penalty phase. Those records included: Sexton's letters and notes; letters from Ironton City Schools; letters to and from psychiatrist Dr. Michael S. Maher, who had examined Sexton prior to the first trial; requests made for hospital records; Sexton's medical records from Dr. Lawrence Saltis, M.D.; jail medical records from Hillsborough County; medical records from Massilon County hospitals; medical records from Union Correctional Institution; memos and notes regarding interviews with Sexton and various witnesses; memos from defense investigator Richard Hart; and letters from Drs. Irving Weiner and Frank Wood, who testified at the retrial.
[9] The PET scan disclosed deficits in the limbic region of Sexton's brain. The limbic system is a group of subcortical structures located in the lower portion of the brain, lying underneath the thalamus and includes the hypothalamus, amygdala and the hippocampus. The limbic system is especially concerned with emotion and motivation, See Merriam-Webster's Collegiate Dictionary 675 (10th ed.1999), and according to Dr. Wood, dysfunction in the limbic system can cause impulsivity, intolerance to stress, lack of self-control, and bizarre responses to events.
[10] "Sexual sadism" is classified as a "sexual disorder" under the category of paraphilia in the Diagnostic and Statistical Manual of Mental Disorders, § 14 (302.84) (4th ed. 2007) ("DSM-IV"). Dr. Stein testified that a "sexual psychopath" is someone who is antisocial and acts out in a sexually deviant way. "Sadistic sexual psychopath" has been used to describe a type of personality disorder. See State v. Castaneda, 150 Ariz. 382, 724 P.2d 1, 11 (1986) (involving psychiatric testimony that being a sexual psychopath is a personality disorder as opposed to a mental illness).
[11] Sexton contends that Dr. Stein testified that the neuropsychological testing done for the trial was "not adequate," but the inadequacy she cited was Dr. Weiner's failure to test and control for possible malingering, or the faking of symptoms, by Sexton during the testing.
[12] Dr. Stein explained that paraphilia is a deviant sexual disorder that includes pedophilia and hebephilia. See DSM-IV § 14 (302.70, 302.2). Pedophilia refers to sexual interest in or activity with pre-pubescents, while hebephilia refers to the sexual interest in or activity with adolescents.
[13] The eleven summarily denied claims are as follows: (1) failing to object to the prosecutor's reference to his "able" investigator, thereby bolstering the witness's credibility; (2) failing to object to certain venire members walking in and out of the courtroom during jury selection; (3) failing to object when the State introduced a religious reference by thanking God that the lawyers were not on trial; (4) failing to request individual voir dire after four venire members indicated they had heard details of the case; (5) failing to object to the State's opening statement referring to expected testimony of Sexton's sexual abuse of Willie; (6) conceding to sexual abuse and unusual relationships in the Sexton family, which bolstered the State's case; (7) failing to object to the State's failure to lay a foundation for introduction of testimony from the Ohio social worker about Sexton fathering two of his daughter's children; (8) failing to object to questions the State asked Willie on direct examination seeking speculation of how he and others felt on a variety of issues, and failing to object to testimony by Willie to hearsay statements; (9) failing to object to a statement from daughter Pixie about a threat from Sexton that was covered by the previous motion in limine; (10) failing to object to the State's introduction of Sexton's videotape directed to President Clinton; and (11) failing to object to the State's disparaging remarks about counsel during the State's closing argument.
[14] We reiterate our admonition made in Doorbal that "[t]he purpose of an appellate brief is to present arguments in support of the points on appeal ... [and] to merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient to preserve issues." 983 So.2d at 482.
[15] Facts regarding the Ohio social services' actions, the incident in which Sexton barricaded himself in his home, and the fact that Sexton became a fugitive were known to the jury because these facts had been presented as evidence relevant to why the family came to Florida and why Sexton was desperate to keep Joel from returning to Ohio. See Sexton, 775 So.2d at 926.